Opinion by Judge REINHARDT; Partial Concurrence and Partial Dissent by Judge POOLE.
*1528 REINHARDT, Circuit Judge:
I. Facts
In 1979, debtor Victoria Farms, Inc. (“Victoria Farms”) mortgaged its farm to Equitable Life Assurance Society of the United States (“Equitable”). See S.E.R. tab 1, Ex. A, at 7. The mortgage took the form of a “deed of trust,” which simply granted Equitable a lien on the property. In return, Victoria Farms received $350,000.00.
In 1988, Victoria Farms mortgaged its farm to a second creditor, Visalia Production Credit Association (“Visalia”). See id. at 9. This second mortgage also took the form of a “deed of trust.” In return, Victoria Farms received $376,720.00 from Visalia.
II. Prior Proceedings
A. Bankruptcy Court. In 1990, Victoria Farms voluntarily filed for bankruptcy under Chapter 11 of the United States Bankruptcy Code. Pursuant to the bankruptcy court’s approval, Victoria Farms sold the farm in the fourth quarter of 1991 for $594,804.60. Of this amount, $421,447.57 was paid to the first mortgagee (Equitable) by the escrow agent, and $37,150.05 was paid for various closing costs.
The remainder ($136,206.98) was placed in an impound account, which was administered by Victoria Farm’s lawyer. The lawyer distributed $130,434.98 in the first quarter of 1992 to the second mortgagee (Visalia). Although Victoria Farms still owed Visalia $52,-051.64, Visalia accepted the disbursement as payment in full. Victoria Farms kept the remaining $5,772.00.[1]
In 1992, the bankruptcy court dismissed the case. The court held that Victoria Farms was required to pay St. Angelo, the regional United States trustee, only $400.00 in fees under 28 U.S.C. § 1930(a)(6).[2] In calculating the fees, the court excluded the sale proceeds from the farm because it had been “indirectly” distributed by others (i.e., the escrow agent and the lawyer). Thus, it concluded that the trustee was only entitled to the minimum amount under the bankruptcy statute.[3]
B. District Court. St. Angelo appealed the bankruptcy court’s judgment to the district court, claiming that under 28 U.S.C. § 1930(a)(6) he was in fact entitled to $4,250.00 in fees. St. Angelo argued that, under the terms of the statute, he was entitled to (i) $3,750.00 for the $594,804.60 disbursement to the first creditor, and (ii) $500.00 for the $130,434.98 disbursement to the second creditor. See id. Without providing any explanation, the district court rejected St. Angelo’s argument and held that the term “disbursement” in 28 U.S.C. § 1930(a)(6) excludes all payments made to a secured creditor from the sale proceeds of the secured property. St. Angelo timely appeals.
III. St. Angelo’s Appeal
Before reaching the merits of St. Angelo’s claim, we must address two issues raised by Victoria Farms on appeal. First, Victoria Farms claims that 28 U.S.C. § 1930 is constitutionally invalid and therefore we may not reach the issue of the fee payments. Second, Victoria Farms claims that it lacks funds to pay St. Angelo should he succeed on this appeal and that St. Angelo’s claim is therefore moot.
*1529 A. Uniformity Clause Challenge. Victoria Farms asserts that 28 U.S.C. § 1930 is invalid under the Uniformity Clause, which empowers Congress to enact “uniform Laws on the subject of. Bankruptcies throughout the United States.” U.S. Const, art. I, § 8. It claims that, because the U.S. Trustee program — and the fee system which supports it — has not been implemented in Alabama and North Carolina, the law governing the fee system is not uniform and therefore must be struck down- in its entirety. Accordingly, it asserts that St. Angelo has no standing to bring this appeal and is not entitled to any fees. Although Victoria Farms did not raise this issue in the proceedings below, it is purely a question of law and, accordingly, we have discretion to address it. Bolker v. Commissioner, 760 F.2d 1039, 1042 (9th Cir.1985).
Under the Bankruptcy Reform Act of 1978, Pub.L. No. 95-598, 95th Cong., 2d Sess. (1978), Congress established the U.S. Trustee program for an experimental period in 18 judicial districts. The program was intended to alleviate some of the administrative burdens faced by bankruptcy judges, to eliminate the appearance of favoritism arising from the close relationship that existed between judges and trustees, and to address the problem of “cronyism that exists in many parts of the county in the appointment of trustees by bankruptcy judges.” H.Rep. No. 595, 95th Cong., 2d Sess. 108 (1978), reprinted in 1978 U.S.C.C.A.N. pp. 5787, 5963, 6069. The success of the program prompted Congress to replace the pilot program with a permanent national program through the Bankruptcy Judges, United States Trustees, and Family Farmer Bankruptcy Act of 1986, Pub.L. No. 99-554, 99th Cong.2d Sess. (1986). Congress chose to phase the program in over a.two-year period for every state except North Carolina and Alabama. In contrast to the other 48 states, North Carolina and Alabama had the option of voting in the U.S. Trustee program; they were required, however, to implement the program by October 1,1992. Bankruptcy Act of 1986, Pub.L. No. 99-554, 99th Cong., 2d Sess. § 302 (1986). Although Congress provided an explanation for its decision to phase in the program over a two-year period for the other 48 states in a report accompanying the Act, it made no mention of the separate provisions governing North Carolina and Alabama. See H.Rep. No. 764, 99th Cong., 2d Sess. 29-30 (1986), reprinted in 1986 U.S.C.C.A.N. 5227, 5241-42.
Several years later, in section 317 of the Judicial Improvements Act of 1990, Congress extended 'the deadline for North Carolina and Alabama to implement the U.S. Trustee program to October 1, 2002. Pub.L. No. 101-650, 101st Cong., 2d Sess. § 317(a) (1990). Again, Congress failed to provide an explanation for this extension, despite the fact that the ten-year extension was considerably longer than the original extension outlined in the Bankruptcy Act of 1986.
St. Angelo asserts that, despite the absence of any congressional statement, Congress intended to create two parallel programs in order to study the effect of the U.S. Trustee system upon the administration of bankruptcy proceedings. The sole justification he provides for his assertion is a 1992 GAO report. See GAO, Bankruptcy Administration: Justification Lacking for Continuing Two Parallel Programs (Sept.1992).
The GAO report, however, does not provide any information about Congress’ intent in providing separate treatment for North Carolina and Alabama. Indeed, it significantly undermines St. Angelo’s claim. First, the report makes clear that Congress provided no justification for either of its decisions to delay the implementation of the program in North Carolina and Alabama. Indeed, the authors of the report were compelled to rely upon their own discussions with bankruptcy judges and officials in the affected states to discover any possible explanation for the implementation period. Id. at 14. Clearly, the statements made by affected parties to GAO officials after Congress’ enactment of section 317 do not represent a reliable indicator of congressional intent.
Second, the report directly contradicts St. Angelo’s assertion that Congress twice extended the implementation period for North Carolina and Alabama for the purpose of studying the differences between the two systems. In fact, the report offers an entire *1530 ly different reason for the original extension. The report notes that “our discussion with bankruptcy judges and BA program officials [for the system currently in effect] in North Carolina and Alabama indicated that the impetus for having the BA program in the two states was their extreme dissatisfaction with the operation of the [U.S. Trustee] pilot program in the Northern District of Alabama.” Id. at 14. Having cited that justification for the initial extension, the report finds absolutely no justification for Congress’ subsequent decision in 1990 to extend the implementation period for an additional ten years. With respect to the extension contained in section 317 of the Judicial Improvements Act of 1990, the report explicitly notes, “[w]e could not find any justification for continuing two separate programs.” Id', at 16 (emphasis added). Indeed, because the problems in the Northern District of Alabama had been resolved, the report harshly criticizes section 317 for “giv[ing] the BA program the appearance of permanence.” Id. [4]
St. Angelo also argues that the U.S. Trustee program serves a purely administrative function and therefore is not constrained by the requirements of the Uniformity Clause. We disagree.
For the purpose of the Uniformity Clause, the Supreme Court has defined bankruptcy as the “ ‘subject of the relations between an insolvent or nonpaying or fraudulent debtor and his creditors, extending to his and their relief.’ ” Railway Labor Executives Ass’n v. Gibbons, 455 U.S. 457, 466, 102 S.Ct. 1169, 1175, 71 L.Ed.2d 335 (1982) (citing Wright v. Union Central Life Ins. Co., 304 U.S. 502, 513-14, 58 S.Ct. 1025, 1031-32, 82 L.Ed. 1490 (1938)).
The statute clearly governs the relationship between creditor and debtor and, accordingly, falls within the scope of the Uniformity Clause. The U.S. Trustees have assumed the supervisory roles of the bankruptcy judges. Indeed, the statute entrusts U.S. Trustees with extensive discretion to appoint interim and successor trustees, monitor and supervise bankruptcy proceedings, examine debtors, advise the bankruptcy courts, and even, in some circumstances, to seek dismissal of cases. See, e.g., 11 U.S.C. §§ 343, 701, 703, 704, 707 & 727; 28 U.S.C. § 586. Thus, the U.S. Trustees’ activities have a direct effect upon the rights and liabilities of both debtors and creditors.
The U.S. Trustee program is not only intimately connected to the government’s regu *1531 lation of the relationship between creditor and debtor, it also has a concrete effect upon the relief available to creditors. Because debtors in states other than North Carolina and Alabama must pay higher fees for the supervision of bankruptcy proceedings, the current system reduces the amount of funds that the debtor can ultimately pay to his creditors in the other 48 states.
Given that the Uniformity Clause applies to the statutory provision at issue, we now turn to the question of whether section 317(a) of the Judicial Improvements Act of 1990, Pub.L. No. 101-650, 101st Cong., 2d Sess. § 317(a) (1990), violates the Uniformity Clause.
The Uniformity Clause requires that bankruptcy laws enacted by Congress be geographically uniform. Vanston Bondholders Protective Comm. v. Green, 329 U.S. 156, 172, 67 S.Ct. 237, 244-45, 91 L.Ed. 162 (1946); Hanover Nat’l Bank v. Moyses, 186 U.S. 181, 188, 22 S.Ct. 857, 860, 46 L.Ed. 1113 (1902).
A bankruptcy law may have different effects in various states due to dissimilarities in state law as long as the federal law itself treats creditors and debtors alike. As the Supreme Court noted in Green, the effect of a law may differ due to variations in state law as long as the “existing obligations of a debtor are treated alike by the bankruptcy administration throughout the country, regardless of the State in which the bankruptcy court sits.” Green, 329 U.S. at 172, 67 S.Ct. at 244; see also Gibbons, 455 U.S. at 469,102 S.Ct. at 1176-77; Stellwagen v. Clum, 245 U.S. 605, 613, 38 S.Ct. 215, 217, 62 L.Ed. 507 (1918); Moyses, 186 U.S. at 190, 22 S.Ct. at 861.
It is clear that this is not a provision which has different effects within North Carolina and Alabama due to differences in the laws of these two states. North Carolina and Alabama are the only states given the option to vote to adopt the U.S. Trustee system before the end of the implementation period, and these two states are the only ones that need not implement the system until October 1, 2002. It is federal law, rather than state law, that causes creditors and debtors to be treated differently in North Carolina and Alabama.
Congress may enact non-uniform laws to deal with geographically isolated problems as long as the law operates uniformly upon a given class of creditors and debtors. The Supreme Court has upheld a bankruptcy statute governing railroad reorganization in one region on the ground that, because no railroad reorganization was pending outside that region, the law “operates uniformly upon all bankrupt railroads.” Regional Rail Reorganization Act Cases, 419 U.S. 102, 158-60, 95 S.Ct. 335, 365-67, 42 L.Ed.2d 320 (1974). The Court noted in Regional Rail Reorganization Act Cases that “the uniformity clause requires that the Rail Act apply equally to all creditors and all debtors.” Thus, the Court’s holding depended on the fact that “ ‘no provision of the Act restricts the right of any creditor wheresoever located to obtain relief because of regionalism.’ ” Regional Rail Reorganization Act Cases, 419 U.S. at 160, 95 S.Ct. at 367.
In Gibbons, the Supreme Court reaffirmed this principle, noting that it is acceptable to enact a law governing a particular region, but warning that “a law must at least apply uniformly to a defined class of debtors.” Gibbons, 455 U.S. at 473, 102 S.Ct. at 1178. Similarly, in the context of construing the Uniformity Clause governing taxation laws, the Supreme Court held that a tax was acceptable if it applied equally to ships in all ports, even if the tax did not apply to other modes of conveyance. Head Money Cases, 112 U.S. 580, 595, 5 S.Ct. 247, 252, 28 L.Ed. 798 (1884); see infra note 4 (noting that interpretations of the Uniformity Clause with regard to tax cases may provide guidance for applications of the Uniformity Clause to bankruptcy laws).
In this case, however, Congress has provided no indication that the exemption in question was intended to deal with a problem specific to North Carolina and Alabama, nor can we discern such a purpose in the structure of the statute or the legislative history of the amendment. Indeed, because creditors and debtors in states other than North Carolina and Alabama are governed by a *1532 different, more costly system for resolving bankruptcy disputes, see supra p. 13243, it is clear that 28 U.S.C. § 1930, as currently amended, does not apply uniformly to a defined class of debtors.
We need not address what standard we would use to determine whether, had Congress provided a justification for treating members of the same class differently, the 1990 amendments to section 1930 would withstand constitutional scrutiny. Congress simply did not provide an explanation for its decision. Thus, although the Supreme Court has not clearly articulated a standard for scrutinizing Congress’ decision to enact nonuniform bankruptcy laws,[5] section 317(a) must fail. Under any standard of review, when Congress provides no justification for enacting a non-uniform law, its decision can only be considered to be irrational and arbitrary.
In addition, Gibbons requires that, to survive scrutiny under the Bankruptcy Clause, “a law must at least apply uniformly to a defined class of debtors.” Gibbons, 455 U.S. at 473, 102 S.Ct. at 1178 (emphasis added). The provision in question fails even this most basic requirement. As we noted above, the relationship between creditor and debtor in states other than North Carolina and Alabama is governed by a different, more costly system than the two states to which the section 317(a) exemption applies. See supra p. 13243. In the absence of any evidence that Congress was addressing a geographically isolated problem or some other legitimate concern, we are required to hold that its decision to ignore the Uniformity Clause in enacting section 317(a) renders that section unconstitutional.[6]
Victoria Farms asserts that, if we find section 317(a) to be unconstitutional, we must strike down all the provisions governing the U.S. Trustee fee system. We disagree.
In determining whether the statutory scheme governing the U.S. Trustee system in general, and the fee structure outlined in 28 U.S.C. § 1930 in particular, are unconstitutional, we must adhere to the principle of judicial restraint. As Justice Brandéis noted in his well-known concurrence to Ashwander v. Tennessee Valley Authority, 297 U.S. 288, 56 S.Ct. 466, 80 L.Ed. 688 (1936), courts must cautiously exercise their power to declare a statute constitutionally void and narrowly confine their holdings when possible. Indeed, Justice Brandéis observed that “[t]he Court will not ‘formulate a rule of constitutional law broader than is required by the precise facts to which it is applied.’ ” Ashwander, 297 U.S. at 347, 56 S.Ct. at 483 (Brandéis, J., concurring) (citing Liverpool, *1533 N.Y. & P.S.S. Co. v. Emigration Commrs., 113 U.S. 33, 39, 5 S.Ct. 352, 355, 28 L.Ed. 899 (1885)).
Applying these principles to the case at hand, we confine our decision to the 1990 amendments to 28 U.S.C. § 1930. Section 317(a) of the Judicial Improvements Act of 1990 is the basis for the existence today of a different statutory scheme governing the relationship between debtors and creditors in Alabama and North Carolina. It is section 317(a) that guarantees that creditors and debtors in the 48 other states are governed by an dissimilar, more costly bankruptcy system than members of the same groups in Alabama and North Carolina.
The constitutional infirmity in question may be remedied simply by striking down section 317(a). There is no need to address the question of whether Congress’ decision to phase the program in gradually was unconstitutional, or even whether Congress’ initial decision to extend the implementation period only for North Carolina and Alabama violated the Uniformity Clause. These two issues were not specifically raised on appeal and, in any event, they are now moot since Congress originally provided that the U.S. Trustee program would be implemented in every state, including North Carolina and Alabama, by October 1, 1992. Bankruptcy Act of 1986, Pub.L. No. 99-554, 99th Cong., 2d Sess. § 302 (1986). By striking down section 317(a)’s amendment of 28 U.S.C. § 1930 rather than 28 U.S.C. § 1930 in its entirety, we leave in place a uniform law governing bankruptcy throughout the nation. Thus, we decline to invalidate all of section 1930 or any other part of the statutory scheme governing the U.S. Trustee system.[7] Accordingly, the U.S. Trustee may bring this appeal.
B. Mootness Challenge. Victoria Farms next asserts that St. Angelo’s appeal is moot because it has distributed all of the funds the bankruptcy court had disbursed to it and can no longer pay the fee sought by St. Angelo. We reject this argument.
We may only dismiss an appeal if it is impossible to fashion “relief that is both effective and equitable.” See In re Spirtos, 992 F.2d 1004, 1007 (9th Cir.1993). The burden is on the movant to demonstrate that an appeal is moot. Matter of the Brickyard, 735 F.2d 1154, 1159 (9th Cir.1984).
A court may properly award fees even after a bankruptcy case has been dismissed. See U.S.A. Motel Corp. v. Banning, 521 F.2d 117, 119 (9th Cir.1975) (per curiam). In addition, Victoria Farms has not met its burden of demonstrating that this court cannot fashion effective relief.[8] Thus, Victoria Farms has provided no reason to justify dismissing St. Angelo’s appeal as moot.
C. The Fee Question. Turning to the merits of the appeal, we find that the district court erred by excluding the sale proceeds of Victoria Farm’s secured property in calculating St. Angelo’s fees. As noted above, the district court held — without citing any legal authority — that the term “disbursements” excludes all payments to a secured creditor from the sale proceeds of the secured property.[9]
*1534 The term “disbursements” is not defined anywhere in 28 U.S.C. § 1930(a)(6), its legislative history, or the case law. However, a plain language reading of the statute shows that Congress clearly intended “disbursements” to include all payments from the bankruptcy estate. As the Supreme Court noted in Perrin v. United States, 444 U.S. 37, 42, 100 S.Ct. 311, 314, 62 L.Ed.2d 199 (1979), “[a] fundamental canon of statutory construction is that ... words will be interpreted as taking their ordinary, contemporary, common meaning.” The definition of “disburse” is “to expend ... pay out.” Webster’s Third New International Dictionary 644 (1976).
The statute does not in any way distinguish between payments to secured creditors and payments to non-secured creditors. See 28 U.S.C. § 1930(a)(6). Nor is there any indication in the legislative history that Congress intended such a result.[10] The statute merely states that the trustee is entitled to fees based on the total amount of “disbursements” from the estate. Id. Accordingly, the district court’s interpretation is simply without merit.[11]
Upon appeal, Victoria Farms apparently concedes that the plain language of 28 U.S.C. § 1930(a)(6) does not distinguish between payments to secured creditors and non-secured creditors. See Appellee’s Brief at 25. Instead, it argues that its farm was never part of the bankruptcy estate in the first place — that is, that it relinquished title in the farm when it granted the two “deeds of trust” to Equitable and Visalia in 1979 and 1988.
We reject Victoria Farm’s argument. Under California law, a “deed of trust” creates a lien on the property in favor of the creditor. See Monterey S.P. Partnership v. W.L. Bangham, Inc., 49 Cal.3d 454, 460, 261 Cal.Rptr. 587, 590, 777 P.2d 623, 626 (Cal.1989) (en banc).[12] Under the Bankrupt *1535 cy Code, such a lien gives rise to a secured claim. See 11 U.S.C. § 506(a).[13]
We have expressly held that all property that is subject to a secured claim becomes part of the bankruptcy estate. In re Contractors Equipment Supply Co., 861 F.2d 241 (9th Cir.1988). In In re Contractors Equipment Supply Co. we stated that “[t]he property of the debtor’s estate includes property in which a creditor has a security interest.” Id. at 244. Accordingly, we conclude that the farm was part of Victoria Farms’ bankruptcy estate and its sale proceeds should not have been excluded in calculating St. Angelo’s fees.
IV. Conclusion
We hold that the 1990 amendment to 28 U.S.C. § 1930 renders the statutory scheme governing the U.S. Trustee system non-uniform. Accordingly, we strike down section 317(a) of the Judicial Improvements Act of 1990 as unconstitutional.
Because we can remedy the constitutional infirmity merely by striking down the 1990 amendments, we do not invalidate the U.S. Trustee system in general or the fee structure of 28 U.S.C. § 1930 in particular. Thus, the U.S. Trustee has standing to bring this appeal, and we may reach the merits of his claim.
We hold that the district court erred by excluding the sale proceeds of Victoria Farm’s secured property in calculating St. Angelo’s fees and that the U.S. Trustee is entitled to the full $4,250.00. Accordingly, the judgment of the district court is reversed.
REVERSED AND REMANDED.

. The $5,772.00 was a surcharge that the estate was allowed to keep. See 11 U.S.C. § 506(c).

. 28 U.S.C. § 1930(a)(6) provides as follows:
(6) In addition to the filing fee paid to the clerk, a quarterly fee shall be paid to the United States trustee ... in each case under chapter 11 or title 11 for each quarter ... until a plan is confirmed or the case is converted or dismissed, whichever occurs first. The fee shall be $250 for each quarter in which disbursements total less than $15,000; $500 for each quarter in which disbursements total $15,000 or more but less than $150,000; $1,250 for each quarter in which disburse-merits total $150,000 or more but less than $300,000; $3,750 for each quarter in which disbursements total $300,000 or more but less than $3,000,000; $5,000 for each quarter in which disbursements total $3,000,000 or more....

Id.

.During the fourth quarter of 1991, that amount was $150.00. During the first quarter of 1992, that amount was $250.00. Accordingly, St. Angelo was entitled to a total of $400.00. See 28 U.S.C. § 1930(a)(6).

. One might argue that the existence of the report itself indicates that Congress intended to create two parallel programs in order to study the impact of the U.S. Trustee program upon the 48 other states. Even if we were to set aside our serious reservations about using such a flimsy piece of evidence as an indicator of congressional intent, the argument is unpersuasive.
First, there appears to be no reason to assume that the purpose of section 317 was to compare the two programs merely because Congress requested a study after it enacted section 317. Congress often enacts legislation and subsequéntly requests studies to determine its efficacy.
Moreover, Congress has demonstrated its ability to provide a clear, well-reasoned justification for its decision to create two different programs for comparative purposes. For example, in 1978 Congress created a pilot U.S. Trustee system in 18 districts. Bankruptcy Reform Act of 1978, Pub.L. No. 95-598, § 1501, 92 Stat. 2549, 2652 (1978). In the text of the Act, as well as in the reports accompanying its passage, Congress clearly and repeatedly noted its intention to create an 18-district pilot program in order to study the effects of the new system before implement.ing it on a nation-wide basis. See Bankruptcy Reform Act of 1978, Pub.L. 95-598, § 408, 92 Stat. 2549, 2686 (1978); H.Rep. No. 595, 95th Cong., 2d Sess. 459 (1978), reprinted in 1978 U.S.C.C.A.N. 5963, 6414; "Statements by Legislative Leaders,” reprinted in 1978 U.S.C.C.A.N. 6482; S.Rep. No. 989, 95th Cong.2d Sess. 167 (1978), reprinted in 1978 U.S.C.C.A.N. 5787, 5953.
Given that in 1978 Congress provided a clear justification for its decision to create a pilot program for the purpose of studying the effects of the U.S. Trustee system, there appears to be no reason for its decision to remain completely silent concerning its intentions in extending the implementation period for North Carolina and Alabama in both 1986 and 1990. Indeed, we would be especially hesitant to give any weight to evidence of congressional intent that is as indirect and attenuated as the GAO report in light of (1) the unusual length of the ten-year extension, (2) the fact that Congress had already created a pilot program, and clearly and directly articulated its purpose in doing so, in 1978, and (3) the fact that the extensions undermined Congress' explicit decision to create a "nationwide" program in 1986 due to the success of the 1978 pilot program. H.Rep. No. 764, 99th Cong., 2d Sess. 20 (1986), reprinted in 1986 U.S.C.C.A.N. 5227, 5233.

. The Supreme Court has upheld bankruptcy legislation against an equal protection challenge when Congress provided a "rational justification” for its classifications. United States v. Kras, 409 U.S. 434, 446, 93 S.Ct. 631, 638, 34 L.Ed.2d 626 (1973). In the context of analyzing a Uniformity Clause challenge to a taxation case, which this court may examine when interpreting the Bankruptcy Clause, Regional Rail Reorganization Act Cases, 419 U.S. 102, 161, 95 S.Ct. 335, 367, 42 L.Ed.2d 320 (1974), the court “closely” examined Congress' decision to define a class in geographic terms. United States v. Ptasynski, 462 U.S. 74, 85, 103 S.Ct. 2239, 2245, 76 L.Ed.2d 427 (1983). The Court in that case found “ample evidence” to support Congress' findings and upheld that classification because "[njothing in the Act's legislative history suggests that Congress intended to grant Alaska an undue preference” to members of the class. Id. at 86, 103 S.Ct. at 2245-16. In another due process challenge to a liability-limiting provision of the Price-Anderson Act, the Court noted "the traditional presumption of constitutionality generally accorded economic regulations” and added that such regulation is generally upheld “absent proof of arbitrariness or irrationality on the part of Congress.” Duke Power Co. v. Carolina Environ. Study, 438 U.S. 59, 83, 98 S.Ct. 2620, 2635, 57 L.Ed.2d 595 (1978); see also Usety v. Turner Elkhom Mining Co., 428 U.S. 1, 15, 96 S.Ct. 2882, 2892, 49 L.Ed.2d 752 (1976) (applying the same standard to a black lung benefit provision of the Coal Mine Health and Safety Act of 1969).

. In In re Prines, 867 F.2d 478 (8th Cir.1989), the Eighth Circuit upheld the constitutionality of the fee system against an equal protection challenge. We note that there is no evident conflict between our decisions. The Eighth Circuit addressed an equal protection challenge to the gradual phase-in requirement of the provision. Id. at 484. It did not specifically address the exemption Congress granted to North Carolina and Alabama, and its only reference to the Uniformity Clause was an observation that the Uniformity Clause did not require heightened scrutiny for an equal protection challenge since the Supreme Court had clearly outlined a standard for such challenges. Id. at 485.

.Because we find that the enactment of section 317(a) was constitutionally invalid and therefore that the Act does not contravene the Bankruptcy Clause of the Constitution, our decision does not serve to invalidate past or present adjudications of bankruptcy cases in the Ninth Circuit. We, of course, express no opinion concerning the implications of our decision for the circuits of which Alabama and North Carolina are a part.

.The U.S. Trustee does not specifically assert a claim to the distributed amounts. In addition, Victoria Farms concedes that it has not produced direct proof that it disbursed all of its assets. Appellee's Brief at 12 nn. 5 & 6. It has also failed to demonstrate that the U.S. Trustee cannot obtain funds from its unencumbered assets or future earnings. Finally, Victoria Farms has not demonstrated why St. Angelo cannot request instructions to the bankruptcy court to order the return of the erroneously distributed funds. See In re Int’l Environ. Dynamics, Inc., 718 F.2d 322, 326 (9th Cir. 1983) ("Because [movant] is a party to this appeal, this court could fashion effective relief by remanding with instructions to the bankruptcy court to order the return of erroneously disbursed funds.”).

.The court held:
Here, the court concludes that the ordinary, plain meaning of the statutory language is that payments made by the debtor attributable to property of the debtor whether directly or by a third party acting on the debtor's behalf are to be included in calculating the fees due to the United States trustee pursuant to Section *1534 1930(a)(6). This construction excludes any payment made to a secured creditor of the proceeds of the sale of that security. However, it does not exclude distributions of proceeds of the sale of secured property to the debtor or persons or entities other than the secured creditor or secured creditors.
E.R., tab 8, at 10 (emphasis added).

. Indeed, the sparse legislative histoiy on this issue suggests that Congress intended to adopt an expansive definition of payments that included both secured and non-secured debts. See, e.g., Sen.Rep. No. 989, 95th Cong., 2d Sess., 21, 22 (1978), reprinted in 1978 U.S.C.C.A.N. 5787, 5807, 5808 (noting that the Bankruptcy Reform Act of 1978 chose the "broadest possible definition" for the term “claim”: "any right to payment, whether ... secured, or unsecured") (emphasis added).

. Although no appellate court has addressed this question, there is some consensus on this issue among the lower courts. See, e.g., In re Hays Builders, Inc., 144 B.R. 778, 780 (Bankr.W.D.Tenn.1992) ("All disbursements, whether direct or through a third party, [are] included in the calculation of fees due the trustee under § 1930(a)(6).”); In re Wemerstruck, Inc., 130 B.R. 86, 89 (Bankr.D.S.D.1991) (defining disbursements as any payment made by a debtor); In re Ozark Beverage Co., Inc., 105 B.R. 510, 511-12 (Bankr.E.D.Mo.1989) (defining "disbursements” as "all expenses of a debtor-in-possession in a given quarter,” including "any payment to a pre-petition secured creditor").

.See also Henry P. Miller & Marvin B. Starr, California Real Estate, § 9:2, at 10-11 (2d ed. 1989):
Legal title passes to the trastee solely for the purpose of securing the performance of the obligation, and the trustee receives only such title as is necessary for the execution of his trust....
As a practical matter, the title to the property and all the incidents of title are retained by the trustor, and the deed of trust only imposes a hen on the property....
[[Image here]]
In addition, both the mortgage and the deed of trust are considered as merely liens and not conveyances for purposes of the priority of the rights of the beneficiary or mortgagee vis-a-vis other interests in the property.
Victoria Farms asserts that its argument is directly supported by this court's decision in In re Madrid, 725 F.2d 1197 (9th Cir.), cert. denied, 469 U.S. 833, 105 S.Ct. 125, 83 L.Ed.2d 66 (1984). Madrid, however, concerned Congress' definition of transfer for fraudulent conveyance purposes only. Id. at 1200. Madrid held that Congress could not have intended to treat lien enforcement activities as constructive fraudulent conveyances and, accordingly, found that, for the purpose of 11 U.S.C. § 548, the time of transfer took place when the deed of trust was perfected under Nevada law. Id. at 1200. The decision is therefore inapplicable to this question.

. Section 506(a) states:
An allowed claim of a creditor secured by a lien on property in which the estate has an interest ... is a secured claim to the extent of the value of such creditor’s interest in the estate’s interest in such property....

Id.