**In re A.H. ROBINS COMPANY, INCORPORATED, Debtor.**

**Bankruptcy No. 85–01307.**

United States Bankruptcy Court,
E.D. Virginia,
Richmond Division.

Jan. 27, 1998.

James S. Crockett, Jr., Mays & Valentine, Richmond, VA, for A.H. Robins Co., Inc.

Orran Lee Brown, Richmond, VA, for Dalkon Shield Trust.

Gregg R. Nivala, Asst. U.S. Trustee, Office of U.S. Trustee, Richmond, VA.

## MEMORANDUM OPINION

BLACKWELL N. SHELLEY, Bankruptcy Judge.

This matter comes before the Court on the Motion of the United States Trustee ("the UST") to Compel A.H. Robins Company, Inc. to Pay Quarterly Fees pursuant to 28 U.S.C. § 1930(a)(6). This is a core proceeding over which the Court has jurisdiction under 28 U.S.C. §§ 157(b)(2)(A) and 1334. Venue is proper under 28 U.S.C. § 1409.

Upon consideration of the parties' briefs, and after a hearing held on November 25, 1997, the Court makes the following findings of fact and conclusions of law.

## FINDINGS OF FACT

On August 25, 1985, the A.H. Robins Company, Inc. ("Old Robins") filed a voluntary petition for Chapter 11 reorganization in anticipation of the onslaught of the now-well-known Dalkon Shield litigation. Almost three years later, on July 26, 1988, Old Robins's Sixth Amended and Restated Plan of Reorganization ("the Plan") was confirmed. According to the Plan, the property of the debtor-in-possession vested in the debtor or any successor-in-interest of the debtor, in consonance with 11 U.S.C. § 1141(b). The A.H. Robins Co. Inc. ("New Robins") is the successor in interest of Old Robins.[1]

On January 26, 1996, Congress amended 28 U.S.C. § 1930(a)(6) to require post-confirmation payment of quarterly fees to the UST.[2] Prior to this change, such fees were

---

1. As part of Old Robins's reorganization, American Home Products, Inc. ("AHP") bought out Old Robins, funded the Dalkon Shield Claimants Trust ("Claimants Trust") with $2,450,000,000.00 to pay personal injury claims against Old Robins, and established New Robins as a subsidiary of AHP. In addition to the Dalkon Shield Claimants Trust, the reorganization included the Dalkon Shield Other Claimants Trust funded with $50,000,000.00 for non-personal injury claims, and $100,000,000.00 paid into the Breland Insurance Trust by the Aetna Life and Casualty Company in settlement of the "Breland" class-action lawsuit against Old Robins. The Claimants Trust, Other Claimants Trust, and Breland Insurance Trust still have monies to distribute to claimants, and the operations of these trusts are still being overseen by this Court.

2. Prior to its amendment in 1996, § 1930(a)(6) stated,

[T]he parties commencing a case under title 11 shall pay ... the following filing fees: ... In addition to the filing fee paid to the clerk, a quarterly fee shall be paid to the United States trustee, for deposit in the Treasury, in each case under chapter 11 of title 11 for each quarter (including any fraction thereof) until *a plan is confirmed* or the case is converted or dismissed, whichever occurs first.

(emphasis added).
Section 111(a) of H.R.2076, 104th Cong. (1995) provided as follows: "Section 1930(a)(6) of Title 28, United States Code, is amended by striking 'a plan is confirmed or' ...." H.R.2076 was enacted into via Pub.L. 104–91, § 101(a), 110 Stat. 7, 11 *as amended* Pub.L. 104–99 § 211, 110 Stat. 26, 37 (1996), thus making quarterly UST fees payable post-confirmation.

§ 1930(a)(6) now states:

[T]he parties commencing a case under title 11 shall pay ... the following filing fees: ... In addition to the filing fee paid to the clerk, a

owed only up until the time of plan confirmation. The purpose of such a change was to aid the balancing of the federal budget by making the UST more financially self-sufficient.[3] New Robins began paying the minimum fee of $250.00 per quarter in 1996, and has continued paying this amount up to the present. The UST, questioning the nominal amount of fees paid by New Robins, filed a motion on October 17, 1997 seeking reports from New Robins as to the extent of its quarterly disbursements, and demanding payment of any fees that may be owing as determined by those disbursements.

### CONCLUSIONS OF LAW

■ The 1996 amendment to § 1930(a)(6) ("the Amendment") has generated a staggering amount of litigation due to its remarkably poor drafting. Not only has this new quarterly fees statute spawned a large number of cases, it has caused widespread disparity among the courts in their attempts to apply it. While this Court is reluctant to add to the flood of ink already spilled regarding this subject, to resolve the dispute in the instant case, the following analysis is in order.

The Court first points out that Old Robins's plan confirmation took place almost eight years prior to the Amendment. Nev-ertheless, on September 30, 1996, Congress, through clarifying legislation ("the Clarification") made it known that the Amendment is to apply to *all* cases, regardless of their confirmation status at the time of the Amendment's effective date.[4] Some courts have held that the Amendment is applicable only to cases that did not have a confirmed plan at the time of the Amendment. Many of these cases, however, were decided before the September 30, 1996 Clarification, and most have been reversed on appeal. *See. e.g., In re Beechknoll Nursing Homes, Inc.*, 202 B.R. 260, 261–262 (Bankr.S.D.Ohio 1996), *rev'd sub nom. United States Trustee v. Beechknoll Nursing Homes, Inc. (In re Beechknoll Nursing Homes, Inc.)*, 216 B.R. 925, 928–929 (S.D.Ohio 1997); *In re Hudson Oil Co., Inc.*, 200 B.R. 52, 54–56 (Bankr. D.Kan.1996), *rev'd sub nom. United States Trustee v. Hudson Oil Co. (In re Hudson Oil Co.)*, 210 B.R. 380 (D.Kan.1997); *In re Precision Autocraft, Inc.*, 197 B.R. 901, 905–907 (Bankr.W.D.Wash.1996), *rev'd sub nom. United States Trustee v. Precision Autocraft, Inc. (In re Precision Autocraft, Inc.)*, 207 B.R. 692 (W.D.Wash.1997). Virtually all cases decided since the Clarification have

---

quarterly fee shall be paid to the United States trustee, for deposit in the Treasury, in each case under chapter 11 of title 11 for each quarter (including any fraction thereof) until the case is converted or dismissed, whichever occurs first. The fee shall be $250 for each quarter in which disbursements total less than $15,000; $500 for each quarter in which disbursements total $15,000 or more but less than $75,000; $750 for each quarter in which disbursements total $75,000 or more but less than $150,000; $1,250 for each quarter in which disbursements total $150,000 or more but less than $300,000; $3,750 for each quarter in which disbursements total $300,000 or more but less than $1,000,000; $5,000 for each quarter in which disbursements total $1,000,-000 or more but less than $2,000,000; $7,500 for each quarter in which disbursements total $2,000,000 or more but less than $3,000,000; $8,000 for each quarter in which disbursements total $3,000,000 or more but less than $5,000,000; $10,000 for each quarter in which disbursements total $5,000,000 or more.

**3.** *See infra* note 5.

**4.** The Omnibus Consolidated Appropriations Act, 1997, Pub.L. 104–208, § 109(d), 110 Stat. 3009, 3009–19 (1997), states,

Section 101(a) of Public Law 104–91, as amended by section 211 of Public Law 104–99, is further amended by inserting ": Provided further, That, notwithstanding any other provision of law, the fees under 28 U.S.C. § 1930(a)(6) shall accrue and be payable from and after January 27, 1996, in all cases (including, without limitation, any cases pending as of that date), regardless of confirmation status of their plans" after [the words] "enacted into law".

Section 211 of Public Law 104–99, in turn, reads as follows:

Public Law 104–91 is amended by inserting after the words "the protection of the Federal judiciary" in section 101(a), the following: "to the extent and in the manner and", and by inserting at the end of the paragraph containing those words, but before the semicolon, the following: ": *Provided*, That, with the exception of section 114, the General Provisions for the Department of Justice included in title I of the aforementioned conference report are hereby *enacted into law*."

concluded that the Amendment applies to cases that have confirmed plans, finding that Congress expressly prescribed the proper reach of the Amendment, and that the Amendment is supported by a rational legislative purpose [5] in accordance with the Supreme Court's decision in *Landgraf v. USI Film Products*, 511 U.S. 244, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994). *See, e.g., United States Trustee v. Precision Autocraft, Inc. (In re Precision Autocraft, Inc.)*, 207 B.R. 692, 694–95 (W.D.Wash.1997) (Amendment's reach expressly prescribed); *In re Hudson Oil, Inc.*, 210 B.R. 380, 382–83 (D.Kan.1997) (Amendment's reach expressly prescribed; rational basis for retroactivity of Amendment); *In re Corporate Business Products, Inc.*, 209 B.R. 951, 952–53 (Bankr.C.D.Cal.1997) (same); *In re Huff*, 207 B.R. 539, 541–42 (Bankr.W.D.Mich.1997) (Amendment's reach expressly prescribed); *In re P.J. Keating, Inc.*, 205 B.R. 663, 664–66 (Bankr.D.Mass.1997) (same); *In re Driggs*, 206 B.R. 787, 790–91 (Bankr.D.Md. 1997) (en banc) (same). A number of cases decided before the Clarification also determined that the Amendment had a rational basis, but further held that the Amendment is not substantively retroactive, since it only requires the payment of fees from the date of the Amendment forward. *See, e.g., In re Central Florida Electric, Inc.*, 197 B.R. 380, 381 (Bankr.M.D.Fla.1996); *In re Upton Printing*, 197 B.R. 616, 618–620 (Bankr. E.D.La.1996); *In re Foxcroft Square Co.*, 198 B.R. 99, 102–106 (Bankr.E.D.Pa.1996); *In re McLean Square Assoc.*, 201 B.R. 436, 440–42 (Bankr.E.D.Va.1996).[6] It is beyond doubt, then, that the Amendment is properly applicable to the Chapter 11 proceeding in the case at bar.

(second emphasis added).

5. "The rational legislative purpose" is the desire to balance the federal budget by *inter alia* making the UST system self-sufficient. *In re McLean Square Assoc.*, 201 B.R. 436, 441 (Bankr.E.D.Va. 1996).

6. The Court notes that the Amendment *is*, however, retroactive in the sense that it applies to cases having plans that were confirmed prior to the effective date of the Amendment. As the Court has already discussed, this retroactivity is not improper due to the Amendment's rational legislative purpose, and Congress' explicit intent.

█ This Court agrees that Amendment is undergirded by a rational legislative purpose, and also chooses to align itself with those courts that hold that the Amendment is not substantively retroactive. Because the Court finds that the Amendment is substantively prospective in nature, the Court does not agree with those cases denying payment of UST fees on the ground that the Amendment improperly modifies debtors' plans, such as *In re Hudson Oil Co., Inc.*, 200 B.R. at 53–54. Post-confirmation liability for UST fees is an "administrative expense attendant to an open case," *In re McLean Square Assoc.*, 201 B.R. at 441, and such fees are no different from taxes arising post confirmation, or any similar post-confirmation expenses not specified in the plan. *See In re Maruko, Inc.*, 206 B.R. 225, 229 (Bankr.S.D.Cal.1997). Otherwise, "a plan would in effect immunize a debtor from any new assessments or increases in taxes or fees occurring post confirmation. This argument must fail ..." *In re Richardson Serv. Corp.*, 210 B.R. at 332. The Court finds it ludicrous that some courts would allow the payment of UST fees only if the debtor's plan provided for such payments, *see, e.g., In re Uncle Bud's, Inc.*, 206 B.R. 889, 899 (Bankr.M.D.Tenn.1997), as debtors having plans confirmed before passage of the Amendment could not possibly have had the prescience to ascertain Congress' actions months, or as in the instant case, years, in advance.[7] The Court thus finds that the Amendment does not impermissibly modify the Plan in the case at bar, regardless of the fact that the Plan does not provide for the payment of UST fees, since such fees are attendant to New Robins's still-pending bankruptcy case.[8]

7. One court has held that plans confirmed *after* the effective date of the Amendment must include a provision for the payment of UST fees if the UST is to receive such fees. *See United States Trustee v. Craige (In re Salina Speedway, Inc.)*, 210 B.R. 851, 856–57 (10th Cir. B.A.P. 1997) (denying payment of UST fees on ground that the UST did not object to plan that was confirmed after effective date of Amendment and that did not provide for payment of such fees).

8. Some cases have held that the payment of UST fees is in some way related to the UST's duties in a particular case, e.g., monitoring the debtor and preparing reports. *See, e.g., In re McLean Square*

■ The Court next finds that payment of UST fees in the instant case will terminate upon closing of the case. *See, e.g., In re Driggs,* 206 B.R. at 790–91; *In re Commonwealth Ave. Corp.,* 213 B.R. 794, 795 (Bankr. D.Mass.1997) (citing *In re Jr. Food Mart of Arkansas, Inc.,* 201 B.R. 522, 524–25 n. 2 (Bankr.E.D.Ark.1996)); *In re Sedro–Woolley Lumber Co., Inc.,* 209 B.R. 987, 989–90 (Bankr.W.D.Wash.1997); *In re McLean Square Assoc.,* 201 B.R. at 442–43. The Court does not find convincing the argument that quarterly UST fees are payable only in "aborted" or "unsuccessful" Chapter 11 cases, i.e., cases that have been converted or dismissed, as held in *In re C n' B of Florida, Inc.,* 198 B.R. 836, 839–840 (Bankr.M.D.Fla. 1996) and *In re Boone,* 201 B.R. 499, 500–01 (Bankr.W.D.Tenn.1996). First, the Amendment plainly states that quarterly fees "shall be paid to the United States trustee, for deposit in the Treasury, *in each case* under chapter 11 ..." 28 U.S.C. § 1930(a)(6) (emphasis added). Because the Amendment requires payment of quarterly fees "in each

case," and does not read "in each unsuccessful or aborted case," the Court finds that the Amendment is applicable to successful and unsuccessful Chapter 11 cases alike. *See, e.g., In re Driggs,* 206 B.R. at 791.[9] The Amendment is, therefore, applicable to the instant case as well. In addition, because a "case" no longer exists once it is closed, the Court finds that the obligation to pay UST fees terminates upon closure, dismissal, or conversion of a Chapter 11 case, and will not be paid *ad infinitum. See, e.g., In re Sedro–Woolley Lumber Co.,* 209 B.R. at 990 (citing *In re Burk Development, Co., Inc.,* 205 B.R. 778, 785 (Bankr.M.D.La.1997)); *see also McLean Square Assocs.,* 201 B.R. at 442–43 (once case is closed, conversion or dismissal no longer possible, thus terminating duty to pay quarterly UST fees). It is worth noting that because the obligation to pay fees terminates upon closure of a case, New Robins, after confirmation and upon substantial consummation of its Plan, could have closed its case [10] and hence precluded the need to make

Assoc., 201 B.R. at 443. The Court notes that in the *instant case,* the UST has admittedly done little, if anything, since confirmation of the Plan. New Robins has, however, benefitted from the Court's continued involvement in this still-open case, most recently concerning an action to interpret the Plan, and the Court is still involved in the administration of the various claimants trusts established in this case. *See supra* note 1. In any event, the Court finds nothing in the statute to suggest that the payment of quarterly UST fees depends upon the UST's involvement of the case, thus the UST's actions, or lack thereof, in the case at bar does not affect the payment of such fees.

9. The Court finds that imposing UST fees only on unsuccessful cases would have the following disturbing consequence: Presumably, a Chapter 11 debtor facing conversion or dismissal of its case will be liable for all quarterly fees arising from the time it files its petition; and, because it is impossible to ascertain whether a Chapter 11 proceeding is unsuccessful until the moment of conversion or dismissal, no fees will be payable until that moment. So when a Chapter 11 debtor is faltering to the point of being unable to remain in Chapter 11, it will be asked to somehow marshal enough funds to pay for outstanding UST fees that have been accruing since the date of the order for relief. Therefore, the parties who can least afford to pay such fees will be solely responsible for them. The Court cannot believe that such an application of the Amendment is consonant with the Amendment's purpose of aiding the UST in funding itself.

10. Under 11 U.S.C. § 1101(2), "substantial consummation" means "(A) transfer of all or substantially all of the property proposed by the plan to be transferred; (B) assumption by the debtor or by the successor to the debtor under the plan of the business or of the management of all or substantially all of the property dealt with by the plan; and (C) commencement of distribution under the plan."

According to 11 U.S.C. § 350(a), "After an estate is fully administered ... the court shall close the case." Closing of cases in Chapter 11 is governed by Fed. R. Bankr.P. 3022, which provides, "After an estate is fully administered in a chapter 11 reorganization case, the court, on its own motion or on motion of a party in interest, shall enter a final decree closing the case."

A number of cases have held that a case is "fully administered" at the point of substantial consummation. *See, e.g., Walnut Associates v. Saidel,* 164 B.R. 487, 492–93 (E.D.Pa.1994) (citing *In re BankEast Corp.,* 132 B.R. 665, 668 n. 3 (Bankr.D.N.H.1991)); *In re Jordan Mfg. Co., Inc.,* 138 B.R. 30, 34 & n. 1 (Bankr.C.D.Ill.1992) (" 'substantial consummation' is but a breath shy of 'consummation' "). *But see In re Ground Systems, Inc.,* 213 B.R. 1016, 1019 (9th Cir. BAP 1997) ("the terms 'fully administered' and 'substantial consummation' are [not] interchangeable"); *In re Gates Comm. Chapel of Rochester, Inc.,* 212 B.R. 220, 224 n. 3 (Bankr.W.D.N.Y. 1997) ("This Court will not automatically find cases to be fully administered just because they have reached the point of substantial consummation."). In any event,

any further payments to the UST when the Amendment took effect to require the payment of post-confirmation UST fees. It may very well be that at the time of confirmation in July, 1988, New Robins elected to keep the case open on the Court's docket to handles various legal and administrative matters.[11] The Court's docket shows that the bulk of the matters pending before the Court arose after the date of confirmation and involved actions by or against the Claimants Trust. See, e.g., Dalkon Shield Claimants Trust v. Finkel (In re A.H. Robins Co., Inc.), 197 B.R. 513 (E.D.Va.1994) (trust seeking interpretation of Plan and Claims Resolution Facility).[12] When the Amendment was enacted in 1996 to exclude plan confirmation as a cutoff for UST fees, however, the case had

already achieved substantial consummation, and New Robins could have elected to close the case. In compliance with 11 U.S.C. § 350 and Fed. R. Bankr.P. 3022, this Court would have entered the final decree closing the case pursuant to § 8.05(j) of the Plan, hence eliminating any prospective obligation on New Robins's part to pay post-confirmation UST fees.[13] New Robins, however, failed to take such measures to avoid liability to the UST, and instead began paying the minimum fees due according to § 1930(a)(6).

■ Probably the most contentious issue in the case at bar is the interpretation of the term "disbursements" as it is used in the Amendment. Because the amount of fees payable to the UST is premised upon the

The Advisory Committee notes to current Bankruptcy Rule 3022 incorporate the standard of substantial consummation found in Section 1101(2) for determining whether the estate has been fully administered and a final decree should issue: "(1) whether the order confirming the plan has become final, (2) whether deposits required by the plan have been distributed, (3) whether the property proposed by the plan to be transferred has been transferred, (4) whether the debtor or the successor of the debtor under the plan has assumed the business or the management of the property dealt with by the plan, (5) whether payments under the plan have commenced, and (6) whether all motions, contested matters, and adversary proceedings have been finally resolved."
In re Jordan Mfg, Co., Inc., 138 B.R. at 35.
This Court finds that with the exception of the time it has taken to settle the Dalkon Shield Claims in the instant case, all issues existing at the time of Old Robins's bankruptcy filing were resolved prior to January, 1996, thus warranting closure of New Robins's case since the Plan was substantially consummated and the estate fully administered at that time.

11. It was probably not even necessary to keep the case open to handle such matters. As the Advisory Committee Notes to Fed. R. Bankr.P. 3022 state,

The court should not keep the case open only because of the possibility that the court's jurisdiction may be invoked in the future. A final decree closing the case after the estate is fully administered does not deprive the court of jurisdiction to enforce or interpret its own orders and does not prevent the court from reopening the case for cause pursuant to § 350(b) of the Code.... If the plan or confirmation order provides that the case shall remain open until a certain date or event because of the likelihood that the court's juris-

diction may be required for specific purposes prior thereto, the case should remain open until that date or event.
See In re Jordan Mfg., Co., Inc., 138 B.R. at 35 (quoting Advisory Committee Notes to Fed. R. Bankr.P. 3022). There is nothing in the Plan or the order confirming the Plan mandating that New Robins's case remain open until a time or event certain, and thus there was no impediment to New Robins closing its case to avoid liability for quarterly UST fees.

12. The Court notes that many of the proceedings arising post-confirmation related to the administration of, and were filed by, the various trusts responsible for compensating the Dalkon Shield claimants. Nonetheless, New Robins still gleaned a benefit from the Court post-confirmation, and could have closed its case to avoid the payment of UST fees had it wanted to. See infra p. 153.

13. Nevertheless, the possibility of reopening a case begs the question as to whether a debtor whose case is reopened post-Amendment would be liable for quarterly UST fees. In In re Jr. Food Mart of Arkansas, Inc., 201 B.R. 522 (Bankr.D.Ark.1996), the debtor's case was closed prior to the effective date of the Amendment, then reopened for an administrative matter after the Amendment took effect. The UST naturally sought its quarterly fees for the period in which the debtor's case remained open after the Amendment was enacted. The court in In re Jr. Food Mart, however, resolved the issue by closing the debtor's case retroactive to the date on which that case was originally closed, thus precluding the UST from collecting its fees from the debtor in that proceeding. Again, therefore, New Robins could easily have closed its case to avoid liability for UST quarterly fees without risk of being liable for such fees if it were to have reopened its case.

sum total of "disbursements" paid by a party in a Chapter 11 proceeding, the clarification of the scope of this term is, naturally, of great importance to the parties here. While Congress clarified the scope of the Amendment itself, i.e., to whom the Amendment applies, Congress has provided no guidance as to what constitutes a "disbursement." A number of courts, as well as New Robins, place heavy reliance upon *St. Angelo v. Victoria Farms, Inc.*, 38 F.3d 1525 (9th Cir. 1994), *modified* 46 F.3d 969 (1995) for the proposition that "disbursements" for purposes of the Amendment include only payments made out of the bankruptcy estate, *see, e.g., In re Maruko, Inc.*, 206 B.R. 225, 229–30 (Bankr.S.D.Cal.1997); *In re Boulders on the River, Inc.*, 205 B.R. 948, 951 (Bankr. D.Or.1997), or that "disbursements" can only be made pursuant to a confirmed plan of reorganization which disposes of estate assets. *See, e.g., In re Betwell Oil and Gas Co.*, 204 B.R. 817, 818–820 (Bankr.S.D.Fla. 1997); *In re Jamko, Inc.*, 207 B.R. 758, 760–61 (Bankr.S.D.Fla.1996); *In re SeaEscape Cruises Ltd.*, 201 B.R. 321, 322–23 (Bankr. S.D.Fla.1996). *St. Angelo*, which was decided prior to the Amendment's effective date, stated, "The term 'disbursements' is not defined anywhere in 28 U.S.C. § 1930(a)(6), its legislative history, or case law. However, a plain language reading of the statute shows that Congress clearly intended 'disbursements' to include *all* payments from the bankruptcy estate." *St. Angelo*, 38 F.3d at 1534. The cases cited above that limit "disbursements" to payments made from the bankruptcy estate reasoned as follows: since the assets in bankruptcy estate revest in the debtor upon confirmation of a plan pursuant to § 1141(b), there is no bankruptcy estate post-confirmation; hence, there are no "disbursements" made post confirmation, and thus no basis for fees (other than the $250.00 minimum fee) once a plan is confirmed, un-

less provided for in the plan. The Court refuses to distort the holding in *St. Angelo* so as to limit the meaning of "disbursements" to payments made from the bankruptcy estate. First, the *St. Angelo* court merely stated that "disbursements" *include* payments made from the bankruptcy estate. It never stated that "disbursements" are constituted *solely* of such assets, nor that other sources of funds are *excluded* from the meaning of "disbursements." Second, the *St. Angelo* decision was made prior to the Amendment's existence. When *St. Angelo* was decided, fees were not payable post-confirmation, hence UST fees were only premised upon payments from the bankruptcy estate.[14] The court in *St. Angelo*, therefore, had no cause to distinguish between payments made out of the bankruptcy estate and those derived from another source, because prior to the Amendment there was simply no other source for UST fees aside from the bankruptcy estate.[15] *See In re Corporate Business Products, Inc.*, 209 B.R. at 954. Finally, the *St. Angelo* court specifically referred to the ordinary, common meaning of "disbursement," finding that it means solely "to expend … pay out," *St. Angelo*, 38 F.3d at 1534 (citing *Webster's Third New International Dictionary* 644 (1976)), and was obviously not attempting to make "disbursement" a term of art. This Court, therefore, does not find that *St. Angelo* limits the meaning of "disbursements" to payments from the bankruptcy estate, nor that the cases citing *St. Angelo* to support such a limitation were correctly decided. Rather, the Court finds that all post-confirmation payments made by reorganized debtors, as well as payments from the bankruptcy estate, constitute "disbursements" for the purposes of the Amendment. *See In re Corporate Business Products, Inc.*, 209 B.R. at 952–55. Such a construction is most consonant with the Amendment's purpose of fund-

---

14. *See United States Trustee v. Hays Builders, Inc.* (*In re Hays Builders, Inc.*), 144 B.R. 778, 779–80 (W.D.Tenn.1992) (payments made by third parties still considered payments from bankruptcy estate).

15. Some cases that hold that *St. Angelo* established "disbursements" as a term of art further hold that Congress is deemed to have known of

judicially created law when it enacted the Amendment, and hence Congress intended "disbursements" to mean only payments from the bankruptcy estate. *See, e.g., In re Maruko, Inc.*, 206 B.R. at 225. Because the Court finds that *St. Angelo* did not limit the scope of "disbursements," the Court also finds that Congress did not intend to so limit this term.

**152**

ing the UST system. *See id.; In re Gates Comm. Chapel of Rochester, Inc.,* 212 B.R. 220, 225 (Bankr.W.D.N.Y.1997).

The Court turns now to the issue of whether bankruptcy courts have any jurisdiction to hear cases involving the payment of fees under the Amendment, as such issue was raised in *Gryphon at the Stone Mansion v. United States Trustee (In re Gryphon at the Stone Mansion ),* 204 B.R. 460, 462–63 (Bankr.W.D.Pa.1997) (en banc). *See In re Indian Creek Ltd. Partnership,* 205 B.R. 609, 612 (Bankr.D.Ariz.1997); *In re Lancy,* 208 B.R. 481, 486–88 (Bankr.D.Ariz.1997). The Court does not find the analysis of *In re Gryphon* to be particularly compelling. *In re Gryphon* relies on *Goodman v. Phillip R. Curtis Enter., Inc.,* 809 F.2d 228, 232 (4th Cir.1987), for the proposition that after plan confirmation, a bankruptcy court's jurisdiction is limited to matters concerning the implementation or execution of a confirmed plan. *In re Gryphon* overlooks several factors in the *Goodman* case, however. First, *Goodman* dealt with a debtor who was ordered by a bankruptcy court to accept the settlement of a personal injury action that had not been included in the debtor's plan in the first place. In the instant case, though, the Court is not dealing with a matter that is as remote from the main proceeding as was the *Goodman* court, but rather one that is inextricably related to the bankruptcy system, i.e., the funding of the UST system. Second, the *Goodman* court specifically declined to delineate the scope of the bankruptcy court's post-confirmation scope authority, as it stated, "We need not decide whether the statutory limitation on the bankruptcy court's post-confirmation authority is truly 'jurisdictional' in the sense apparently urged by [the debtor]."[16] *Goodman,* 809 F.2d at

232. Moreover, the *Goodman* court continued on to state, "Whatever the technical effect of confirmation on the court's authority under the new Code, it obviously does not divest the bankruptcy court of all jurisdiction in the case." *Id.* The court then noted some of the bankruptcy courts' post-confirmation authority relevant to that case, including the power to modify a previously confirmed plan, and the power to reopen a closed case, the latter of which does not necessarily involve implementation or execution of a plan. The Court finds that because (1) *Goodman* did not circumscribe the bankruptcy courts' post-confirmation authority, and (2) the *Goodman* court noted that there were at least two instances of such authority that did exist outside of § 1142, the power to award UST fees under § 1930(a)(6) falls within the post-confirmation authority of the court. The Court notes that this authority is particularly appropriate where a debtor, such as the one in the instant case, has been aided by the continued involvement of the court in moving towards plan consummation.[17] Another troubling aspect of the *In re Gryphon* case is the holding that bankruptcy courts would have jurisdiction over payment of UST quarterly fees only if debtors' plans provided for them. As the Court has already discussed, debtors could not possibly have made provisions for post-confirmation UST fees before knowing of the Amendment. To hold otherwise would directly conflict with both logic, and Congress' intent for the Amendment to apply to debtors whose plans had already been confirmed when the Amendment took effect. Finally, the Court notes that in any event, the Plan in the instant case reserved for the Court a broad grant of jurisdiction, *see supra* note 10, which would avoid any questions raised by *In re Gryphon. See In re Rich-*

**16.** The "statutory limitation" referred to by the *Goodman* court can be found in 11 U.S.C. § 1142, which reads as follows:

(a) Notwithstanding any otherwise applicable nonbankruptcy law, rule, or regulation relating to financial condition, the debtor and any entity organized or to be organized for the purpose of carrying out the plan shall carry out the plan and shall comply with any orders of the court.

(b) The court may direct the debtor and any other necessary party to execute or deliver or

to join in the execution or delivery of any instrument required to effect a transfer of property dealt with by a confirmed plan, and to perform any other act, including the satisfaction of any lien, that is necessary for the consummation of the plan.

**17.** The Court further notes that in *Official Dalkon Shield Claimants' Committee v. Mabey (In re A.H. Robins Co., Inc.),* 880 F.2d 769 (4th Cir. 1989), the Fourth Circuit acknowledged the broad grant of jurisdiction retained by this Court in the case at bar.

*ardson Serv. Corp.*, 210 B.R. at 336 (reservation of jurisdiction in plan broad enough to grant jurisdiction to award post-confirmation quarterly fees).

In summary, the Court finds that (1) the Amendment is applicable to New Robins, (2) the Plan in the case *sub judice* will not be modified by the imposition of the fees mandated by § 1930(a)(6), (3) the obligation to pay such fees will terminate upon the closing of New Robins's Chapter 11 case, (4) New Robins has been making "disbursements" of an unknown amount upon which the UST's quarterly fees are to be based, and (5) this Court has jurisdiction to award such fees. The Court is not unsympathetic to New Robins's position. Indeed, Congress has done somewhat of a disservice both to the courts as a result of the haphazard drafting of § 1930(a)(6), and to reorganized debtors who must now pay fees that in many cases are not commensurate with the benefits gleaned from the continued involvement of the UST or the bankruptcy court. The Court, however, is bound by the acts of Congress, the strictures of logic, and the principles of *stare decisis*. In light of the above analysis, therefore, New Robins should forward to the UST information concerning the extent of its "disbursements" made since the effective date of the Amendment, and will be liable for the fees thereon pursuant to the schedule set forth in § 1930(a)(6).

As a final matter, the Court is aware of the fact that the various trusts arising out of the reorganization of A.H. Robins Co., Inc. have disbursed, and continue to disburse, funds in compensation for Dalkon Shield-related injuries;[18] a viable argument might well be made that such funds should be included in the total disbursements upon which UST fees are due, if necessary, to yield the maximum amount payable under § 1930(a)(6). Nevertheless, the Court notes that the UST has not sought the payment of fees from any of the various trusts established during the course of A.H. Robins Co., Inc.'s bankruptcy proceeding, although ample authority exists to hold the trusts liable for such fees, had they been made parties to the case at bar. *See, e.g., In re Corporate Business, Prods.,*

*Inc.*, 209 B.R. 951, 955 (Bankr.C.D.Cal.1997) (holding liquidating trust liable for UST fees) (quoting *In re Betwell Oil and Gas Co.*, 204 B.R. 817, 819 (Bankr.S.D.Fla.1997)); *United States Trustee v. Hudson Oil Co., Inc. (In re Hudson Oil Co., Inc.)*, 210 B.R. 380, 384 (D.Kan.1997) (liquidating trust, disbursing trust, and debtor, all liable for UST fees). Because the trusts have not been made parties to this proceeding, the Court does not reach here the conclusion of the liability of the trusts for quarterly UST fees based upon their own disbursements, leaving resolution of that matter to New Robins and those trusts. In any event, the UST cannot collect from both sources. For the present, regardless of the putative liability of the trusts, New Robins is responsible for paying UST fees based on its disbursements pursuant to § 1930(a)(6). An appropriate order in conformity herewith shall be entered separately.

**DALKON SHIELD CLAIMANTS TRUST, Respondent.**

