In the Matter of DANNY'S MARKETS, INC., Danny's Foods Plymouth, Inc., Danny's Livonia, Inc., Danny's Merriman, Inc., Danny's Westland Markets, Inc., Danny's Foods, Inc., Danny's Joy, Inc., Debtors.

Bankruptcy Nos. 97–47062, 97–47067, 97–47073, 97–47074, 97–47075, 97–47076, 97–47077.

United States Bankruptcy Court, E.D. Michigan, Southern Division.

July 29, 1999.

T.N. Ziedas, Detroit, MI, for U.S. Trustee.

Arnold Schafer, Schafer & Weiner, P.C., Bloomfield Hills, MI, for debtor.

## OPINION DENYING TRUSTEE'S MOTIONS TO CONVERT TO CHAPTER 7

WALTER SHAPERO, Bankruptcy Judge.

### I. INTRODUCTION

Debtors commenced seven separate chapter 11 cases on April 28, 1997. The cases were administratively, but not substantively consolidated. The reorganization plans were confirmed on May 1, 1998. Debtors' obligations under the plans were substantially fulfilled by June 30, 1998, with payment in full of all but disputed claims.

Section 1930(a)(6) of title 28 requires that a debtor make the described payments to the U.S. Trustee's office, based on "disbursements" in each calendar quarter, until the case is converted or dismissed. Debtors dispute the amount that the U.S. Trustee ("Trustee") alleges they are obligated to pay. At the June 17, 1999 hearing, the parties mutually told the Court that the payments at issue are for the third and fourth quarters of 1998, and the first quarter of 1999, with the second quarter of 1999 then soon to be due (with possible quarters thereafter potentially implicated as well). The U.S. Trustee ("Trustee") has moved to convert to chapter 7 proceedings, based on non-payment of fees as he calculates them.

### II. SPLIT IN AUTHORITY: THE MEANING OF "DISBURSE-MENTS"

The statute, 28 U.S.C. § 1930(a)(6), specifically provides that,

[i]n addition to the filing fee paid to the clerk, a quarterly fee shall be paid to the United States trustee, for deposit in the Treasury, in each case under chapter 11 of title 11 for each quarter (including any fraction thereof) until the case is converted or dismissed, whichever occurs first. The fee shall be $250 for each quarter in which disbursements total less than $15,000. . . .

28 U.S.C. § 1930(a)(6). The provision continues, listing incremental quarterly fees based on increasing ranges of "disbursements," up to $10,000 for $5,000,000 in disbursements. In *Vergos v. Gregg's Enterprises, Inc.*, 159 F.3d 989, 993 (6th Cir. 1998), the court concluded that "closed" is impliedly included in the phrase "converted or dismissed."

The parties do not dispute the fact that Debtors are required to pay post-confirmation quarterly fees of some amount. The issue is the amount that Debtors must pay (although, as will be noted, there has emerged some question as to the quarter(s) involved). "Disbursements" is a word that Congress left undefined under both § 1930(a) and title 11. The Trustee argues that "disbursements" includes *all* disbursements, including those for all of a debtor's normal post-confirmation operating expenses, such as labor, rent, utilities, inventory, etc. Debtors counter that it covers only disbursements specifically required to be made pursuant to a confirmed and consummated plan of reorganization, i.e. only such things as administrative expenses, and possibly, depending on when they are to occur, initial payments under the plan to creditors, (all of which Debtors made some time ago).

### A. Decisions Supporting the Debtors

Case law supports both positions, although none are binding precedent on this Court. *See In re N. Hess' Sons, Inc.*, 218 B.R. 354, 359 (Bankr.D.Md.1998) (collecting cases). One line of analysis used by

other courts that supports Debtors distinguishes the pre-confirmation bankruptcy estate from the post-confirmation reorganized debtor. In *In re SeaEscape Cruises, Ltd.*, 201 B.R. 321 (Bankr.S.D.Fla.1996), the court found that a petition for relief creates an estate, which is a separate legal entity. 201 B.R. at 323. "Upon a plan's confirmation . . . the bankruptcy estate's assets revest in the name of the reorganized debtor and are no longer part of the estate." *Id.* Therefore, the Court reasoned that fees should be based only on disbursements made by the "estate" pursuant to a confirmed plan. Ordinary course of business disbursements were not to be included. *Id.*

A second rationale used by courts is the unfairness of basing fees on disbursements with respect to which the U.S. trustee has no responsibility for oversight. Two bankruptcy court cases from the southern district of Florida discuss this reasoning. In *In re Jamko, Inc.*, 207 B.R. 758, 760 (Bankr.S.D.Fla.1996), the court held that "[t]he reorganized debtor is no longer subject to the day-to-day administration by the court. . . . Nor is there any monitoring or supervision required by the U.S. Trustee's office with regard to the reorganized debtor." The court in *In re Betwell Oil & Gas Co.*, 204 B.R. 817 (Bankr. S.D.Fla.1997) noted that there are three possible interpretations of "disbursements" under § 1930(a)(6). Under a narrow reading, "property vests in the reorganized debtor on the effective date of a plan and is no longer property of the estate." Therefore, no post-confirmation disbursements would be subject to fee assessment. *Id.* at 818–19. A broad reading would encompass *all* disbursements, whether made pursuant to a plan or part of the day-to-day operation of a reorganized debtor's business. *Id.* at 819.

The *Betwell* court disagreed with both these approaches, opting for the middle ground followed by the *SeaEscape* and *Jamko* courts. As to the narrow approach, the court used the example of a liquidating plan, where fees would clearly be based on post-confirmation disbursements made from the pre-confirmation sale of assets. The court reasoned that it makes no sense to treat "post-confirmation payments made from the liquidation of the remaining assets" differently "just because the remaining assets were vested in a reorganized debtor or liquidating trust at confirmation." *Id.* at 819.

The *Betwell* court also rejected a broad reading of "disbursements." When, post-confirmation, a debtor emerges from bankruptcy, "[n]either the UST or the Bankruptcy Court is involved in the business operations of the reorganized debtor, except to the extent of insuring that the plan is consummated." *Id.* at 819. Pre-confirmation fees are based on quarterly operating reports, of which there are none required post-confirmation. If the broad reading were to be adopted,

> the Bankruptcy Court would be required to monitor the post-confirmation financial operations of a reorganized debtor to insure that a proper accounting is given to the UST each quarter and a proper payment is made to the UST for each quarter until entry of a final decree. The only way to do so would be to require court supervision and operating reports which are not required by statute or rule.

*Id.* The court concluded that it would be a "gross injustice" to follow the broad interpretation. *Id.* at 820.

### B. Decisions Supporting the Trustee

The court in *In re Postconfirmation Fees*, 224 B.R. 793, 796 (E.D.Wash.1998) acknowledged the trustee's "minimal to nonexistent" administrative involvement post-confirmation. However, the court concluded that a remedy would best be left to Congress. *Id.* at 796. Other courts have looked at § 1930(a)(6) as a "revenue generating" measure. The court in *In re N. Hess' Sons, Inc.*, 218 B.R. 354 (Bankr. D.Md.1998) found that Congress intended to generate revenue for the U.S. trustee

system to "finance program operations." *Id.* at 360. "As a revenue measure, the ambiguity in § 1930(a)(6) should be resolved to maximize revenues." *Id.* Because § 1930(a)(6) is "akin to a tax," the court concluded that it must be "construed in a light most favorable to the taxing authority as a matter of public policy." *Id.* (citing *Bob Jones University v. United States,* 461 U.S. 574, 596, 103 S.Ct. 2017, 76 L.Ed.2d 157 (1983)). *See also Vergos v. Uncle Bud's, Inc.,* No. 3–97–0296, 1998 WL 652542, at *7 (M.D.Tenn. Aug. 17, 1998) (relying on *N. Hess' Sons* and rejecting debtors argument that "disbursements" should only include "disbursements to prepetition creditors pursuant to the Plan"). In a unique analysis, the court in *U.S. Trustees v. Boulders on the River, Inc. (In re Boulders on the River, Inc.),* 218 B.R. 528 (D.Or.1997) looked to legislative history and found congressional intent to fund post-confirmation trustee duties. After noting the debtor's argument that the trustee was "rarely involved" post-confirmation, the *Boulders* court read the amended § 1930(a)(6) as "usher[ing] in new post-confirmation monitoring by the UST. The statute can now be read to impose such a duty upon the UST." *Id.* at 540. Thus, instead of finding that fees were not equated to trustee duties, the court found new or extended duties for the trustee.

During the course of oral argument, the Court asked the Trustee questions about the funding of the U.S. Trustee program. The statistical portion of the Trustee's response, contained in a letter to the Court with copies to the parties was:

> The United States Trustee Program is self-funded and does not operate from revenues that are appropriated from the general treasury. This means that the Program is funded from revenues that are generated from a portion of the fees that are associated with the filing of chapter 11 cases and from fees that chapter 11 cases are assessed pursuant to 28 U.S.C. § 1930(a)(6).

> In FY 98, for example, our portion of the chapter 11 filing fees accounted for 38.6% of our operating budget, while the quarterly fees paid by chapter 11 debtors accounted for 61.3% of our operating budget. In FY 97 our portion of the chapter 11 filing fees accounted for 39% of our operating budget, while the quarterly fees paid by chapter 11 debtors accounted for 60.9% of our operating budget.

To have any real meaning for this inquiry, however, one would have to know what portion of the 60.9% might arise from fees calculated and paid on the basis of the method argued for by the Trustee as opposed to what the number is on the basis of the method argued for by the Debtors.

### C. Legislative History

The term "disbursements" is open to interpretation, and thus "[t]he court must look beyond the language of the statute ... when the text is ambiguous." *Vergos v. Gregg's Enterprises, Inc.,* 159 F.3d 989, 990, 992 (6th Cir.1998) (noting "that Congress was less than careful in its use of [chapter 11] terms of art"). Looking to the legislative history, courts have generally agreed that § 1930(a)(6) represents a *user's* fee. *See U.S. Trustee v. Gryphon at the Stone Mansion,* 166 F.3d 552, 554 (3d Cir.1999) ("Historically, § 1930(a)(6) set forth a scheme to impose the costs of the United States Trustee Program on its users.") (citing H.R.Rep. No. 99–764, at 22 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5227, 5234); *In re Postconfirmation Fees,* 224 B.R. at 795 (finding purpose was "to make the U.S. Trustee system self-funded and, to the extent possible, to have users of the bankruptcy system rather than the general public absorb the costs of the system"); *N. Hess' Sons,* 218 B.R. at 360 (finding congressional intent was to generate revenue for the U.S. trustee system to finance its operations).

Before the 1996 amendment, which added post-confirmation fee assessments, the U.S. trustee's office was faced with declin-

ing filings and thus a decline in fees, although a significant number of chapter 11 cases remained open post-confirmation. *See Boulders on the River,* 218 B.R. at 533. To correct this, Congress extended the period of time in which fees could be assessed, to the post-confirmation period. The legislative history is clear on this point. Congress intended a fee structure that paid for the U.S. trustee program and *only* the U.S. trustee program.

> H.R. 5316 provides that the [U.S. Trustee] Program will be self-funding and will be paid for by the users of the bankruptcy system—not by the taxpayer.
>
> . . . .
>
> The self-funding mechanism is designed just to fund the U.S. Trustee Program—not to make money for the government. If the self-funding mechanism in the bill generates much more money than is needed to fund the Program, Attorney General is directed to transmit to Congress specific recommendations on how the fee structure should be changed.
>
> . . . .
>
> Section 117 establishes a special fund in the U.S. Treasury, called the United States Trustee System Fund, from which the U.S. Trustee Program will be funded. . . . It is the intent of the Committee that the monies generated from fees added by H.R. 5316 be at least equal to the money needed to fund the U.S. Trustee Program each year, so that the Program will be self-funded by the users of the bankruptcy system—at no cost to the taxpayer.
>
> . . . .
>
> This provision ensures that the self-funding mechanism cannot become a general fund raising method for the government.

H.R.Rep. No. 99–764, at 22, 25–26 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5227, 5234, 37–38.

" 'The requested increase [was] critical to ensure that there is an entity in the bankruptcy process which will require debtors to meet their post confirmation responsibilities under the law.' " *Boulders on the River,* 218 B.R. at 533–34 (quoting Fiscal Year 1996 Budget Justifications, U.S. Trustee Fund, p. 12–13 (1995) (attached as Exhibit A to the opinion)). "For cases to remain on the docket in an active status when debtors are not *meeting their obligations as specified in the restructuring plan* is a patent abuse of the bankruptcy system." *Id.* at 533 (quoting 1996 Budget Justifications) (emphasis added). "[B]ecause *cases with assets to administer* often take two to three years, the pending caseload still in progress will require ongoing attention. . . . The additional fees . . . will provide the resources necessary to ensure adequate post-confirmation oversight and supervision of Chapter 11 cases." *Id.* at 534 (quoting H.R.Rep. No. 104–196, at 16–17 (1995)) (emphasis added). The emphasized language would appear to indicate that Congress was thus looking at additional funding for trustee oversight of chapter 11 cases that had, through confirmation, moved beyond the fee-assessment time frame, where the trustee had material and continuing administrative and oversight responsibilities over estate assets in confirmed, but as yet unconsummated plans.

### III. ANALYSIS

The strongest argument for Debtors' position is the fundamental unfairness of basing trustee fees on disbursements over which there is no oversight responsibility. The strongest argument to counter this is that revenue-generating provisions should be construed broadly. In finding for the trustee in *N. Hess' Sons,* the court relied on the Supreme Court's decision in *Bob Jones University,* which dealt with the tax-exempt status of a religious school under the Internal Revenue Code. *See* 461 U.S. at 577, 103 S.Ct. 2017, 218 B.R. at 360. However, the flaw in the "broad construction" argument is that it

does not distinguish between a user fee and a tax. A tax is a public, "pecuniary burden ... to support the government ... [, and is] imposed generally ... without reference to peculiar benefits to particular individuals or property." Black's Law Dictionary 1307 (5th ed.1979). A user fee, on the other hand, is "a charge designed as compensation for government-supplied services, facilities, or benefits." *United States v. United States Shoe Corp.*, 523 U.S. 360, —— 118 S.Ct. 1290, 1292 (1998) (citation omitted) (distinguishing user fee from tax for purposes of determining constitutionality under the Export Clause). User fees are intended to reimburse the government "for costs incurred in providing specific quantifiable services, ... [and] they are not true revenue measures." *Commonwealth Edison Co. v. Montana*, 453 U.S. 609, 622 n. 12, 101 S.Ct. 2946, 69 L.Ed.2d 884 (1981) (citations and internal quotations omitted). " '[T]he fees charged [should] not appear to be manifestly disproportionate to the services rendered.....' " *Id.* (quoting *Clark v. Paul Gray, Inc.*, 306 U.S. 583, 599, 59 S.Ct. 744, 83 L.Ed. 1001 (1939)). In addition, fees should "reflect a fair, if imperfect, approximation of [associated] costs." *American Charities v. Pinellas County*, 32 F.Supp.2d 1308, 1318 (M.D.Fla.1998) (citing *Evansville–Vanderburgh Airport Authority v. Delta Airlines*, 405 U.S. 707, 717–20, 92 S.Ct. 1349, 31 L.Ed.2d 620 (1972)).

Contrary to the assertion of the *N. Hess' Sons* court that the intent was "to maximize revenues," 218 B.R. at 360, Congress instead intended to charge users for the services provided by the U.S. trustee program. However, the U.S. Trustee's office has little or no oversight responsibility for a reorganized debtor's daily financial and business operations, even a newly reorganized one. Indeed, in cases where there are active, well-represented creditors' committees, as was the case here, the U.S. Trustee's own priorities minimize the Trustee's involvement, even prior to confirmation, let alone after. What the Trustee here proposes is to, in effect, charge

Debtors fees for the kinds of services that will likely not be rendered, and to be reimbursed for operating costs that the Trustee will likely not incur. *See Michel v. HSSI, Inc. (In re HSSI, Inc.)*, 193 B.R. 851, 853–54 (N.D.Ill.1996) (noting that congressional intent was that the U.S. trustee's office be self-funding but not profit making) (citing H.R.Rep. No. 99–764, at 22 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5227, 5234–35). If Debtors, with their confirmed and consummated plans, are subject to paying what amounts to a tax on their operating expenses, the cost will likely passed along to consumers, and the taxpayer ultimately would become the funder of the U.S. trustee program. Thus, not only would the program generate a profit, this profit would come at taxpayer expense. This is directly contrary to congressional intent that the program be funded "by the users of the bankruptcy system—at no cost to the taxpayer ... [and] that the self-funding mechanism [not] become a general fund raising method for the government." H.R.Rep. No. 99–764, at 25–26 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5227, 5238.

■ An argument might be made that the Court should take a more conservative approach and follow the *In re Postconfirmation Fees* court, which decided that the remedy is best left to Congress. *See* 224 B.R. at 796. This argument might have some weight in light of the fact that significant over- or under-payments into the fund require that the Attorney General submit a report to Congress detailing recommendations as to how the fees should be changed. "It would then be for the Congress to determine how the fee structure should be modified." H.R.Rep. No. 99–764, at 25–26 (1986), *reprinted in* 1986 U.S.C.C.A.N., at 5238. However, it is also clear that user fees should not be "manifestly disproportionate to the services rendered," *Commonwealth Edison*, 453 U.S. 622 n. 12, 101 S:Ct. 2946, and instead, should "reflect a fair, if imperfect, approximation of costs." *American Charities*, 32

F.Supp.2d at 1318 (citing *Evansville–Van-derburgh Airport*, 405 U.S. at 717–20, 92 S.Ct. 1349). As noted, Congress intended that the U.S. trustee program be self-funded by user fees. Post-confirmation administration by the U.S. Trustee is limited to ensuring that a debtor meets its obligations under a confirmed plan. *Boulders on the River*, 218 B.R. at 533–34; *Jamko, Inc.*, 207 B.R. at 760. *Betwell Oil & Gas*, 204 B.R. at 819. In fact, the Trustee plays little, if any, role in overseeing a reorganized debtor's daily business and financial operations. Under the self-funding scheme, intended to cover costs and only costs, it would be "manifestly disproportionate" for debtors to reimburse the U.S. trustee program for nonexistent services that it has no responsibility to provide, and which could thus not be considered as a "fair approximation of costs," and thus the fee computation structure, as argued by the Trustee, does not meet the U.S. Supreme Court's test for valid user fees.

The Trustee's position also fails to recognize an important and material distinction between pre- and post-confirmation situations. Prior to confirmation, a chapter 11 debtor is subject to the periodic financial reporting and filing obligations, hereinafter referred to, the necessary complement of which is review and oversight, particularly on the parts of the U.S. trustee and any creditors' committee—all as part of the active on-going administration of the case in Bankruptcy Court. Once confirmation occurs, the situation changes and all such reporting and oversight essentially cease, except possibly for the monitoring of the specific payments or distributions required to be made to pre-petition, or administrative creditors incident to consummation of the plan and administrative closing of the case. Normally the case is actually closed administratively (often within a few months of confirmation), except in situations where the parties request it be administratively open—mostly to sort out claim disputes that do not involve the U.S. trustee. In such situa-

tions, it might even be argued that the case is substantively, if not technically, "closed" and thus brought within the *Vergos* case doctrine. Beyond that, by any reasonable definition, a chapter 11 confirmed plan debtor cannot really be considered anywhere near as much as an ongoing "user" of the bankruptcy system as it was pre-confirmation, except possibly to the extent of the limited oversight necessary and incident to consummation of a confirmed plan and any action necessary to address the consequences of a failure to consummate.

Support for the Debtors' position is also discernable elsewhere. Fed.R.Bankr.Proc. 2015(a)(5) has, since 1991, required a reorganizing chapter 11 debtor-in-possession to:

> on or before the last day of the month after each calendar quarter until a plan is confirmed or the case is converted or dismissed, file and transmit to the United States trustee a statement of disbursements made during each calendar quarter and a statement of the amount of the fee required pursuant to 28 U.S.C. § 1930(a)(6) that has been paid for such calendar quarter.

Clearly in the context of this Rule, the reference to "converted or dismissed" can only be a reference to a conversion or dismissal that might occur *prior* to any possible confirmation. Thus, the obligation to submit the statement of "disbursements" (and that reference must be read to be one to that same word as used in § 1930(a)(6)), ends with confirmation. Logically and inferentially, so, therefore, does the obligation to pay the fee based on the type and kind of disbursements that were, prior to confirmation (or dismissal or conversion), required to be reported. Interestingly, when § 1930 was revised in 1996 in the manner that has raised the issue in this case, nothing was done to change the referred to Rule 2015 requirement (which was then in existence and continues to this day), of filing the state-

ment of disbursements, but only until confirmation. This militates in favor of a conclusion that the concept or meaning of "disbursements" in § 1930 *before* confirmation could very well be one thing, and that after confirmation quite another. The Court sees no good reason why that could not be the case. It also tends to either neutralize or cast doubt on the Trustee's rationale that the 1996 revision extending § 1930(a)(6)'s reach past confirmation necessarily carried with it the same manner of calculating or meaning of "disbursements" as existed prior to confirmation. The Editors' Comment to the Norton Bankruptcy Law and Practice volume on the Bankruptcy Rules states, in reference to the 1991 change in Rule 2015(a)(5):

> The 1991 Amendments also deleted the requirement for the filing of postconfirmation reports and the requirement to make an application for a final decree after consummation of a plan. The Advisory Committee found that postconfirmation reports were rarely filed and § 1106(a)(7) imposes a duty to make any reports that are necessary or ordered by the court....

> The 1991 Amendments added the requirement for a Chapter 11 to provide to the United States Trustee during each calendar quarter a statement of disbursements in the amount of quarterly fee required under 28 U.S.C. § 1930. This was added to assist the United States Trustee in monitoring the appropriate fees payable in Chapter 11 cases.

9 *Norton Bankruptcy Law & Practice 2d* 143–44 (William L. Norton, Jr., ed., 1998). The language of the last quoted sentence suggests the existence of a strong a link between the mandated quarterly report and the fees payable. If the purpose of the required pre-confirmation statement of disbursements (which includes *all* business expenses) is primarily to enable the U.S. Trustee to monitor and check the chapter 11 debtor's calculation of the quarterly fee, and the obligation for filing that statement ceases on confirmation, the obligation to pay a fee based on such disbursements would logically also then be found to cease.

To some extent this issue is also bound up with the matter of the issuance of a final decree and consequent administrative closing of a chapter 11 case. Fed. R.Bankr.Proc. 3022 on that subject states: "After an estate is fully administered in a chapter 11 reorganization case, the court, on its own motion or on motion of a party in interest, shall enter a final decree closing the case." This Rule is an effectuation of § 350 of the Code. Local courts are given and exercise rather broad discretion on this matter. In the Eastern District of Michigan, for some time, upon confirmation of a chapter 11 plan, the clerk has promptly mailed a notice to all interested parties stating that the court will find that the estate has been fully administered and will enter a final decree closing the case in thirty days unless, within that time, an objection is filed; and that if one is filed, it will be set for hearing. The current notice emanating from this Court, as recently amended, ends by saying: "If the closing is delayed past this time period for any reason, the burden will be on the debtor's counsel to notify the clerk when it is appropriate to close the case so that unnecessary U.S. Trustee fees will not accrue." As a matter of further interest and contextual framework for this matter, the Court undertook a review of the court docket as to this particular judge's *confirmed* chapter 11 cases from January 1, 1994 to December 31, 1998, to determine the time periods between plan confirmations and case closings (final decree), and thus the potential (possibly unknowing) exposure of confirmed chapter 11 plan debtors to the potential of the Trustee's position in this case—possibly a trap for the unwary. In that five calendar year period, this Court confirmed some 101 cases. The interval between confirmation and closing averaged some 284 days with the low being thirty-one days and the high some 1195 days. Some sixty-five percent of closings occurred within 300 days of confirmation and some twenty-five percent within 100 days.

The analysis did not extend to comparing the figures with those of other judges, or to differentiating between operating and liquidating plans, nor to the various reasons why the closing of particular cases was extended beyond the indicated thirty days after confirmation—all matters that might bear on any conclusions one might care to draw from the referred to figures.

Interestingly enough and somewhat surprising, in this particular case, on August 5, 1998, *Debtors* (not the U.S. Trustee) filed an objection to the proposed closing of these cases, following receipt of the indicated notice from the clerk after confirmation on May 1, 1998. On September 30, 1998, an order was entered in connection therewith, which stated that "IT IS HEREBY ORDERED that these bankruptcy cases are administratively closed effective September 30, 1998." (Docket entry # 487.) In their mutual determination to do vigorous battle, it appears that the parties did not call this to the Court's attention, and either overlooked the existence of that order or failed to appreciate its possible effect, if nothing else, on the scope of the dispute. In this Court's view, it would arguably limit the real controversy to any fees due for the quarter ending September 30, 1998, rather than having it include the subsequent quarters the parties apparently thought (and told the Court) they were disputing. The docket does not reveal any order that extended that date—although there have been ongoing matters primarily relating to claims, thereafter pursued in a way that appears to have blithely disregarded the cited order closing the case.

As an overlay to an even fuller understanding of the chapter 11 closing process, one should refer to the Memorandum of Understanding between the Executive Office for the United States Courts Regarding Case Closing and Post–Confirmation Chapter 11 Monitoring, dated October 9, 1991. (This was amended effective April 1, 1999, but not in a way materially affecting its purport for the issue before the Court.) Its avowed purpose was to set forth and allocate the responsibilities and procedures pertaining to the closing of cases and the monitoring of chapter 11 cases after confirmation. Among other things, it states that the U.S. Trustee will review any application for a final decree pursuant to his overall responsibility to monitor the case, the debtor-in-possession, or the trustee. It further states that the U.S. Trustee will object to such application or report if deemed appropriate. Finally, it says:

> If no objection has been filed within 30 days of the filing of the report(s), a presumption can be made that the estate has been properly administered. Where no timely filed report has been filed, the United States Trustee will undertake efforts to secure the filing of the final report, or seek the appropriate remedy from the court.

As was noted above in the comments to Rule 2015, relatively few chapter 11 confirmed debtors file such reports or motions for final decrees. Indeed that phenomenon (together with the U.S. Trustee not systematically undertaking the indicated efforts) likely led to the described local closing practice. The point is that unless the closing is delayed by action of the debtor, theoretically at least, the Trustee has taken a responsibility, the proper performance of which, in the Court's view, militates against, and in a sense conflicts with, the position of the Trustee in this case.

Finally, even if the Trustee's view were correct, conversion of the cases would not necessarily be the appropriate remedy, particularly, although not necessarily limited to, in cases such as this, where the Debtors have apparently performed all of their obligations under their confirmed plans. Section 1112(b)(10) permits conversion or dismissal of a chapter 11 case, whichever is in the best interest of creditors and the estate, for cause, including non-payment of fees due the U.S. Trustee. In this case, as between conver-

sion or dismissal, dismissal would clearly be much more in the best interest of the creditors, than conversion, for what in essence would be for the sole purpose of having a chapter 7 trustee attempt to collect and liquidate assets in order to pay the U.S. Trustee fees. The most appropriate remedy would be neither dismissal nor conversion, but rather for the Court to determine the correct amount of the fees owed to the U.S. Trustee and enter a money judgment in favor of the U.S. Trustee, which would be enforced under applicable state or federal law like any other money judgment a government agency might have against a judgment debtor.

## V. CONCLUSION

Accordingly, for all of the various indicated reasons, the Trustee's motions to convert are denied. Debtors shall submit an order consistent with this opinion. To the extent that there may remain a controversy as to the amount of any fees due, the submitted order shall reflect a procedure for disposing of it, or the parties, prior to submission of the order, shall discuss such with the Court. The Debtors have filed motions for sanctions against the Trustee stemming from his initiation of the dispute resolved by this opinion. That matter, by agreement, was deferred pending the outcome of Trustee's motions to convert. To the extent Debtors now wish to pursue the sanctions matter, the procedure for doing so should also be addressed in the submitted order.