**In re CASH COW SERVICES OF FLORIDA, L.L.C., Cash Cow F–1, L.L.C., Cash Cow F–15, L.L.C., Debtor.**

**No. 99–79997–TLH4.**

United States Bankruptcy Court,
N.D. Florida,
Tallahassee Division.

May 19, 2000.

Charles Edwards, Office of U.S. Trustee, Tallahassee, FL, for U.S.T.

Louis L. Long, Jr., Tallahassee, FL, for debtor.

### MEMORANDUM OPINION AND ORDER ON UNITED STATES TRUSTEE'S MOTION TO COMPEL FULL PAYMENT OF QUARTERLY FEES

LEWIS M. KILLIAN, Jr., Bankruptcy Judge.

THIS MATTER is before the Court upon the Motion of the United States Trustee to compel full payment of the quarterly fees owed by the Debtor pursuant to 28 U.S.C. § 586[1] and 28 U.S.C. § 1930(a)(6).[2] This Court has jurisdiction

---

1. 28 U.S.C. § 586. Duties; supervision by Attorney General. (a) Each United States trustee, within the region for which such United States trustee is appointed, shall—... ' (3) supervise the administration of cases and trustees in cases under chapter 7, 11, 12 or 13 of title 11 by, whenever the United States trustee considers it to be appropriate—... (D) taking such action as the United States trustee deems to be appropriate to ensure that all reports, schedules, and fees required to be filed under title 11 and this title by the debtor are properly and timely filed....

2. 28 U.S.C. § 1930 (1996). Bankruptcy fees: (a) Notwithstanding § 1915 of this title, the parties commencing a case under title 11 shall pay to the clerk of the court the following filing fees: (6) In addition to the filing fee paid to the clerk, a quarterly fee shall be paid to the United States trustee, for deposit in the Treasury, in each case under chapter 11 of title 11 for each quarter (including any frac-

tion thereof) *until the case is converted or dismissed, whichever occurs first* (emphasis added). The fee shall be $250 for each quarter in which disbursements total less than $15,000; $500 for each quarter in which disbursements total $15,000 or more but less than $75,000; $750 for each quarter in which disbursements total $75,000 or more but less that $150,000; $1,250 for each quarter in which disbursements total $150,000 or more but less than $225,000; $1,500 for each quarter in which disbursements total $225,000 or more but less than $300,000; $3,750 for each quarter in which disbursements total $300,-000 or more but less that $1,000,000; $5,000 for each quarter in which disbursements total $1,000,000 or more but less than $2,000,000; $7,500 for each quarter in which disbursements total $2,000,000 or more but less that $3,000,000; $8,000 for each quarter in which disbursements total $3,000,000 or more but less than $5,000,000; $10,000 for each quarter in which disbursements total $5,000,000

pursuant to 28 U.S.C. §§ 151, 157(b)(2)(B), and 1334. At issue is whether the flow of cash in the form of title loans from the Debtor to its various customers constitutes "disbursements" subject to fees payable to the United States Trustee. For the reasons more fully outlined below, the Motion of the United States Trustee is GRANTED. The fees owed by the Debtor for the third and fourth quarters of 1999 are to be calculated based upon the methodology propounded by the UST.

### Factual Summary

Debtor operates a chain of stores that provide title loans to its customer base. Debtor has discontinued its check cashing business. The title loan business is described by our sister court in *In re Burnsed,* 224 B.R. 496, 499–500 (Bankr. M.D.Fla., Jacksonville Div.1998) as follows:

> Florida Statutes Chapter 538 regulates trade, commerce, investments and solicitations of secondhand dealers.... This section defines a "title loan" as "a loan of money secured by bailment of a certificate of title to a motor vehicle...."
>
> F.S. § 538.03(1)(i).
>
> Secondhand dealers include any persons engaged in the business of entering title loan agreements. F.S. § 538.03(1)(a). Florida Statutes Chapter 538 requires that secondhand dealers entering title loan contracts maintain physical possession of the motor vehicle title and that the owner maintain possession of, or control over, the motor vehicle throughout the transaction. F.S. § 538.06(5). A secondhand dealer engaged in a motor vehicle title loan transaction may repossess the motor vehicle upon failure of the owner to redeem the title. § 538.06(5)(d) (West 1998).

*In re Burnsed,* 224 B.R. at 499–500.

The title loan business is dissected further by Jarret C. Oeltjen, *Florida Pawnbroking: An Industry in Transition,* 23 Fla.St.U.L.Rev. 995, 1006 (Spring 1996). Oeltjen states:

> [I]n many respects, a title loan is virtually indistinguishable from a more traditional loan using an automobile as collateral, i.e. a "secured transaction." In the traditional setting, as in the title loan arena, the customer/borrower retains possession, and the lender notes its security interest on the title and retains possession of that title. However, these two forms of the same type of title transaction are also very different in cost to the borrower and degree of protection of the borrower's interest. A conventional loan using an automobile as collateral would be subject to the Florida usury law and its eighteen percent per annum interest ceiling. A title loan is subject to a ... ceiling [of] ... twenty-two percent *per month* [emphasis added]....
>
> If the ... [borrower] defaults on either its secured loan or its title loan, the respective lender has repossession of the collateral as an available remedy. But here the similarity ends. First, the repossession of secured loan collateral is expressly subject to the "no breach of the peace rule," which the repossession of title loan collateral is not. Second, the secured loan collateral can be sold only at a commercially reasonable sale after reasonable notice to the ... [borrower], while the only restriction on the sale of title loan collateral is that it be sold through a licensed motor vehicle dealer, an illusory protection at best. Finally, upon sale of secured loan collateral, the ... [borrower] is entitled to any surplus of the sales proceeds over the loan balance plus expenses of sale and repossession, but the ... [borrower] is also liable for any deficiency. After repossession of title loan collateral, the ... [borrower] is neither entitled to a sales surplus nor liable for a sales deficiency.

or more. The fee shall be payable on the last day of the calendar month following the calendar quarter for which the fee is owed. An individual commencing a voluntary case or a joint case under title 11 may pay such fee in installments.

23 Fla.St.U.L.Rev. at 1005–06.

Cash Cow Services of Florida, L.L.C., a managerial entity, plus fifteen separate operational entities, labeled Cash Cow F1 through Cash Cow F15, are jointly administered under the instant case. In essence, the Debtor advances cash to its customers in exchange for possession of automobile titles. As a bailee, the Debtor enjoys an interest rate of up to 22% *per month* as a fee earned in fulfillment of its duties as a bailee. The investment of cash by the Debtor in possession of the titles of properties owned by its customers gives Cash Cow access to an income stream that would be the envy of a traditional buyer of inventory for resale. In the event of default by its customer, the Debtor-as-bailee may then move upon the title by repossession of the collateral, thus generating additional or alternative flows of revenue. Provided that the Debtor is not loaning cash in excess of the value of the collateral secured by the title, Cash Cow has the potential of making a profit on the transaction whether or not the customer fulfills its contractual obligations

The instant case is preconfirmation; no Chapter 11 plan has been confirmed to date. The Debtor's 1999 third quarter monthly operating reports showed total disbursements of $152,458.00 and calculated fees owing to the Trustee in the amount of $4,250.00. The Debtor's calculations did not include any amounts attributed to the loans made in the ordinary course of the Debtor's business to its customers. The United States Trustee calculated the total disbursements by the Debtor, including the funds advanced as loans to its customers, in the amount of $1,820,908.00. Fees owing on these disbursements were calculated at $12,750.00 by the Trustee, suggesting an outstanding fee claim of $8,500.00.

For the fourth quarter of 1999, the Debtor showed disbursements of $732,-502.00 with fees owed of $8,000.00. The Trustee's calculations for this period showed $10,391,325.00 in disbursements and $56,750 fees owed. The difference in the fee calculation for the fourth quarter was $48,750.00. The total fees amount in dispute is $57,250.00.

## Discussion

The United States Trustee argues that any flow of money from the bankruptcy estate is a disbursement that forms the basis for the quarterly fee calculation, pursuant to 28 U.S.C. § 1930(a)(6). Debtor contends that the title loans are actually leases of the Debtor's inventory (cash) to its customers, with the Debtor holding the title as security for the payment of the lease. Debtor argues that these payments to its customers are not disbursements in the sense that they are not payments for an expense, but a retail exchange of its product (cash) for the customer's payment (the title).

The parties' characterization of the dispute is centered on the construction of the statute. The Trustee argues in favor of following the plain language of the statute, wherein any flow of funds from the bankruptcy estate would be subject to the fee calculation. The Debtor argues in favor of interpreting the statute according to the plain meaning of the word "disbursement" as it relates to payments that redeem expenses of the business, but not its loans to customers, which it considers the equivalent of its gross sales.

 The United States Trustee System Fund was created by Congress to insure that the United States Trustee Program would be "self-funded by the users of the bankruptcy system—at no cost to the taxpayer." *In re SeaEscape,* 201 B.R. 321, 323 (Bankr.S.D.Fla.1996) *analyzing* H.R.Rep. 764, 99th Cong., 2d Sess. 22, 1986 U.S.C.C.A.N. 5227, 5234. Courts have generally agreed that § 1930(a)(6) represents a user's fee.[3] *In the Matter of*

---

**3.** See *U.S. Trustee v. Gryphon at the Stone Mansion,* 166 F.3d 552, 554 (3d Cir.1999)

("Historically, § 1930(a)(6) set forth a scheme to impose the costs of the United States Trust-

*Danny's Markets, Inc.,* 239 B.R. 342, 346 (Bankr.E.D.Mich., S.Div.1999). "... [T]he § 1930(a)(6) fees are ... a revenue generating mechanism to fund the U.S. Trustee program." *In re N. Hess' Sons, Inc.,* 218 B.R. 354, 360 (Bankr.D.Md., at Baltimore, 1998). As a revenue generating mechanism, the UST fees are akin to a tax. *Id.* Tax laws are to be construed in a light most favorable to the taxing authority as a matter of public policy. *See e.g., Bob Jones Univ. v. United States,* 461 U.S. 574, 595, 103 S.Ct. 2017, 76 L.Ed.2d 157 (1983) (recognizing "the primary authority of the IRS and its predecessors in construing the Internal Revenue Code.").

■ The quarterly fee provision found at 28 U.S.C. § 1930(a)(6) establishes a sliding scale for U.S. Trustee fees based upon the total amount of quarterly disbursements made by the bankruptcy estate in Chapter 11 cases. *SeaEscape* at 323. During a Chapter 11 case, the debtor-in-possession's quarterly obligations to the UST are calculated from the operating reports which the debtor-in-possession must file. *In re Betwell Oil and Gas Co.,* 204 B.R. 817, 819 (Bankr.S.D.Fla.1997).

The term "disbursement" is not defined anywhere in 28 U.S.C. § 1930(a)(6), or its legislative history. *St. Angelo v. Victoria Farms, Inc.,* 38 F.3d 1525, 1534 (9th Cir. 1994). The cases have ascribed a variety of meanings to the term. " 'Disbursements' means all expenses of a debtor-in-possession in a given quarter." *In re Ozark Beverage Co., Inc.,* 105 B.R. 510 (Bankr.E.D.Mo.1989). "[T]he term includes 'all payments' made by the bankruptcy estate." *St. Angelo v. Victoria Farms* at 1534; *SeaEscape* at 323. Prior to the [1996] amendment, "disbursements" clearly included all disbursements. *In re*

*Jamko, Inc.,* 240 B.R. 645, 647 (Bankr. S.D.Fla., Ft. Lauderdale Div. 1999).

■ "[I]n 28 U.S.C. § 1930(a)(6), as amended in 1996, the term 'disbursements' ... was meant by Congress to include any and all funds, including plan payments and operating expenses, paid out by the debtor, or the reorganized entity, for any reason, during the entire pendency of the chapter 11 case...." *In re Bushnell* and *In re Key Marketing, Inc.,* 1997 WL 701318 (Bankr.D.Vt.1997). The *St. Angelo* decision was decided prior to the 1996 amendment, and "was undoubtedly correct in holding that all payments from the 'bankruptcy estate' were 'disbursements' under § 1930 because that case involved preconfirmation payments." *In re Pettibone Corp.,* 244 B.R. 906, 919 (Bankr. N.D.Ill., E.Div.2000).

In *In re P.J. Keating Co.,* 205 B.R. 663 (Bankr.D.Mass.1997), the court stated:

[p]rior to being amended, section 1930(a)(6) applied only to preconfirmation debtors.... *Until confirmation, all payments made in the operation of a business necessarily come from the estate* (emphasis added). Congress has given no indication that ordinary course of business payments should not also increase the fees payable by ... debtors. Congress intended to enhance revenues by these amendments....

*In re Keating* at 663.

In *In re HSSI, Inc.,* 176 B.R. 809 (Bankr.N.D.Ill.1995), the Bankruptcy Court defined "disbursement" as "a payment of a claim or an expense incurred by the debtor." 176 B.R. at 810. On appeal by the UST, the District Court rejected that narrow definition in favor of a more expansive interpretation "For the purpose of this court's review, this court construes

---

ee Program on its users.") (citing H.R.Rep. No. 99–764, at 22 (1986), reprinted in 1986 U.S.C.C.A.N. 5227, 5234); *In re Postconfirmation Fees,* 224 B.R. at 795 (finding purpose was "to make the U.S. Trustee system self-funded and, to the extent possible, to have users of the bankruptcy system rather than

the general public absorb the costs of the system"); *In re N. Hess' Sons, Inc.,* 218 B.R. 354, 360 (Bankr.D.Md., at Baltimore, 1998) (finding congressional intent was to generate revenue for the U.S. trustee system to finance its operations).

'disbursement' to mean—at least—a transfer of money by the debtor in possession where the debtor has some interest in that money." *In re HSSI, Inc.,* 193 B.R. 851, 854 (N.D.Ill., E.Div.1996).

### Analysis

While the operation of the Debtor's business does not mirror that of a traditional retailer, there is guidance from cases that classify non-traditional transactions as expenditures subject to the UST fee.

In *In re Meyer,* 187 B.R. 650 (Bankr. W.D.Mo.1995), the debtor's escrow agent used the proceeds from a real estate sale to make payments to secured creditors holding liens against the property. After resolving an issue related to the valuation of the property of the estate, *Id.* at 653, the Court held that the disbursements were subject to the quarterly fees pursuant to the statute. These payments were held to be disbursements irrespective of who makes the disbursement [on behalf of the debtor], or to whom the disbursement is made. *Id.*

In *In re HSSI, Inc.,* 193 B.R. 851 (N.D.Ill., E.Div.1996), the Debtor and its twenty-seven wholly owned subsidiaries operated approximately 92 retail clothing stores in twenty four states. *See, In re HSSI, Inc.,* 176 B.R. 809, 811 (Bankr. N.D.Ill., E.Div.1995). The Debtor did not operate the stores, but acquired and consigned the inventory to the retail outlets. The sales revenue flowed from the subsidiaries into local "blocked" bank accounts, and from there into a "concentration" account controlled by the Debtor's secured financier. The Bankruptcy Court held that the transfers between bank accounts were intra-corporate and not economic activity, and denied the UST's motion that both the Debtor and its subsidiaries should pay fees based on the transfers. The District Court remanded the case back to the Bankruptcy Court for further explanation of the underlying economic arrangement. "The Bankruptcy Court's conclusion that the intent of section 1930 was to impose a

fee measured by the level of 'real economic activity' finds no support in the text of the statute nor in any legislative history." 193 B.R. at 855.

In *In re Pars Leasing,* 217 B.R. 218, 219 (Bankr.W.D.Texas, Austin Div.1997), the debtor's sole source of revenue came from payments that it received under vehicle leases it had with various motor freight common carriers for the truck tractors that were owned by the Debtor. Generally, the carriers deducted certain expenses of operation pursuant to the terms of the leases from the payments it made to the debtor. The issue was whether the disbursements calculated for UST fee purposes should be limited to those payments actually made by the debtor, or whether the fee calculation should include the disbursements made by the carriers on behalf of the debtor pursuant to the terms of the leases. *Id.* The Court held that the fee was to be calculated on both the actual disbursements by the debtor and those disbursements made by the common carriers on the debtor's behalf. *Id.* at 221.

■ In the instant matter, funds flow from the preconfirmation estate to a customer-bailor, in exchange for an income earning opportunity flowing to the Debtor-as-bailee. The Debtor argues that disbursements for the purpose of the fee calculation are limited to payments of claims or expenses incurred by the Debtor. This argument, while adopted by the Bankruptcy Court in *In re HSSI, Inc.,* 176 B.R. at 810, was rejected by the District Court on appeal, 193 B.R. at 853. There being no legal precedent cited by the Debtor that would serve to limit the application of the fee calculation to capital flowing from the preconfirmation bankruptcy estate for this purpose, it is hereby

ORDERED AND ADJUDGED that the United States Trustee's Motion to Compel Full Payment of Quarterly Fees is GRANTED. Absent objection by the

Debtor regarding the UST's calculation of the disbursements cited by the UST in support of its motion, the Debtor shall pay to the United States Trustee the sum of $57,250.00, which represents the outstanding fees for the third and fourth quarters of 1999.