**In re QUALITY TRUCK & DIESEL INJECTION SERVICE, INC.,**
Debtor.

No. CIV.A. 3:99–0746.

United States District Court,
S.D. West Virginia,
Huntington Division.

Aug. 10, 2000.

Frederick L. Delp, Barboursville, WV, for debtor.

Debra A. Wertman, Charleston, WV, for appellant.

## MEMORANDUM OPINION AND ORDER

GOODWIN, District Judge.

This appeal presents the question whether 28 U.S.C. § 1930(a)(6) requires payment of post-confirmation quarterly fees on only those disbursements made pursuant to the debtor's reorganization plan or, as the appellant United States Trustee (Trustee) contends, upon all post-confirmation disbursements. I conclude that quarterly fees must be paid on all post-confirmation disbursements and therefore reverse the contrary holding of the bankruptcy court and remand for further proceedings.

### I.

The facts are not in dispute. On September 8, 1995, Quality Truck & Diesel Injection Service, Inc. (Quality Truck) filed a voluntary petition for Chapter 11 reorganization. The bankruptcy court confirmed Quality Truck's Plan of Reorganization (the plan) on May 13, 1997. When Quality Truck filed a report of debtor and moved for a final decree closing the case, the Trustee objected to the closing on the ground that Quality Truck had failed to pay any of the quarterly fees that accrued post-confirmation of the plan pursuant to 28 U.S.C. § 1930(a)(6). The bankruptcy court conducted a hearing on the motion to address the Trustee's objection on October 6, 1998. Quality Truck conceded that quarterly fees were due, but argued that the calculation of the amount owing should be based only on post-confirmation disbursements made pursuant to the plan.

On June 29, 1999, the bankruptcy court issued an order granting Quality Truck's motion for final decree and closing the case effective October 6, 1998. The bankruptcy court found that Quality Truck owed quarterly fees "based upon actual disbursements made by Debtor under its

confirmed Plan of Reorganization from the date of confirmation of Debtor's Plan through October 6, 1998," refusing to find that fees were due on all post-confirmation disbursements. During the October 6, 1998 hearing, the bankruptcy court reasoned:

I choose to go with the weight of authority that you look at plan payments, not total income and post-petition disbursements after confirmation. For the reason that the confirmation order in this case and the Code does permit the debtor to dedicate its future income to the reorganized business, that is going to be substantially hampered ... if you have got administrative claims that were related to services that were being rendered during the petition process prior of confirmation.

The Trustee appeals from the bankruptcy court's order.

## II.

■ The district courts of the United States have jurisdiction to hear appeals of final judgments, orders, and decrees of the bankruptcy court pursuant to 28 U.S.C. § 158(a)(1). On appeal, a bankruptcy court's findings of fact are reviewed for clear error, and its conclusions of law are reviewed de novo. *See In Re Johnson,* 960 F.2d 396, 399 (4th Cir.1992); Fed. R. Bankr.Proc. 8013. This appeal raises only an issue of law.

## III.

Chapter 11 debtors are required to pay quarterly fees pursuant to 28 U.S.C. § 1930(a)(6). That statute provides:

(a) Notwithstanding section 1915 of this title, the parties commencing a case under title 11 shall pay to the clerk of the district court or the clerk of the bankruptcy court, if one has been certified pursuant to section 156(b) of this title, the following filing fees:

. . .

(6) In addition to the filing fee paid to the clerk, a quarterly fee shall be paid to the United States trustee, for deposit in the Treasury, in each case under chapter 11 of title 11 for each quarter (including any fraction thereof) until the case is converted or dismissed, whichever occurs first. The fee shall be $250 for each quarter in which disbursements total less than $15,000; $500 for each quarter in which disbursements total $15,000 or more but less than $75,000; $750 for each quarter in which disbursements total $75,000 or more but less than $150,000; $1,250 for each quarter in which disbursements total $150,000 or more but less than $225,000; $1,500 for each quarter in which disbursements total $225,000 or more but less than $300,000; $3,750 for each quarter in which disbursements total $300,000 or more but less than $1,000,000; $5,000 for each quarter in which disbursements total $1,000,000 or more but less than $2,000,000; $7,500 for each quarter in which disbursements total $2,000,000 or more but less than $3,000,000; $8,000 for each quarter in which disbursements total $3,000,000 or more but less than $5,000,000; $10,000 for each quarter in which disbursements total $5,000,000 or more. The fee shall be payable on the last day of the calendar month following the calendar quarter for which the fee is owed.

■ The purpose of the quarterly fee is to help defray the costs of the United States Trustee system. *See* 1 *Collier on Bankruptcy,* ¶ 9.06[1] (Matthew Bender 15th Ed. Revised 2000). Congress enacted 28 U.S.C. § 1930(a)(6) specifically as a revenue-generating mechanism to fund the United States Trustee Program. The funds are deposited in the United States Trustee System Fund. This Fund is the source of monies then appropriated by Congress to fund the Program's operations. *See* 28 U.S.C. § 589a (establishing the United States Trustee System Fund). Through such "user fees," Congress ensured that the Program would be paid for "by the users of the bankruptcy system—

not by the taxpayer." H.R.Rep. No. 764, 99th Cong., 2d Sess. 22, *reprinted in* 1986 U.S.C.C.A.N. 5234; *In re Prines,* 867 F.2d 478, 480 (8th Cir.1989); *see also* H.R. Rep. 764, 99th Cong., 2d Sess. 26 ("The U.S. Trustee Program should not have to be self-funding. It provides a great service to our country's bankruptcy system. However, in this time of budget deficit concerns, self-funding becomes a necessity.").

■■■ Originally payment of the quarterly fees were only required until confirmation of the debtor's reorganization plan. However, by amendment effective January 27, 1996 (the Amendment), the fee was extended post-confirmation, so that quarterly fees are now due until the case is either converted or dismissed. *See* Balanced Budget Downpayment Act, I, Pub.L. No. 104–99, § 211, 110 Stat. 26, 37–38 (1996). The Amendment was included in a revenue-generating measure as an attempt to further maximize revenues. *See In re N. Hess' Sons, Inc.,* 218 B.R. 354, 360 (Bkrtcy.D.Md.1998). The Amendment created a tremendous amount of confusion and subsequent litigation. As one bankruptcy court noted, the Amendment "has generated a staggering amount of litigation due to its remarkably poor drafting. Not only has this new quarterly fees statute spawned a large number of cases, it has caused widespread disparity among the courts in their attempts to apply it." *In re A.H. Robins Co., Inc.,* 219 B.R. 145, 147 (Bankr.E.D.Va.1998); *see also In re Betwell Oil and Gas Co.,* 204 B.R. 817, 818 (Bankr.S.D.Fla.1997) ("This litigation has been expensive for debtors, a drain on the limited resources of the [Trustee], a burden on the courts and of absolutely no benefit in the administration of bankruptcy cases.").

First, there was uncertainty as to whether the Amendment applied retroactively to cover the large number of cases that were still pending at the time of enactment, but in which a plan of reorganization was already confirmed prior to the Amendment. After several courts split on the issue, Congress resolved the issue in September 1996 by enacting a clarifying amendment. *See* Omnibus Consolidated Appropriations Act, 1997, Pub.L. No. 104–208, § 109(d), 110 Stat. 3009, 3009–19 (1996). That amendment made it explicitly clear that post-confirmation fees were owed in all cases, even those with confirmed plans at the time of the Amendment. *Id.* Once again, the clarifying amendment was included in a revenue measure. *Id.*

Courts also grappled with the question of whether post-confirmation quarterly fees were required if the bankruptcy case is closed, rather than converted or dismissed under the express language of the statute. The majority of bankruptcy cases close upon successful completion of the reorganization plan. Therefore, several debtors argued that section 1930(a)(6) fees were only due post-confirmation if the case was "aborted" or "unsuccessful" through conversion or dismissal of the case. *See, e.g., In re CF & I Fabricators of Utah, Inc.,* 150 F.3d 1233, 1236–37 (10th Cir. 1998); *A.H. Robins,* 219 B.R. at 149. Although under an express reading of the statute, it appears that fees are due until the case is converted or dismissed, courts reviewed the legislative purpose and history of the statute and concluded that fees are due until a case is converted, dismissed, or closed. *See In re Boulders on the River, Inc.,* 218 B.R. 528, 537 (D.Or. 1997) (stating that "closure of a case after entry of a final decree is also an event that terminates quarterly fees because the existence of a case is a statutory precondition to the assessment of such fees"); *see also Vergos v. Gregg's Enterprises, Inc.,* 159 F.3d 989, 991 (6th Cir.1998); *C.F. & I Fabricators,* 150 F.3d at 1237; *A.H. Robins,* 219 B.R. at 149.

### IV.

#### A.

The most contentious issue created by the 1996 Amendment, and the issue

squarely presented by this appeal, is the interpretation of the term "disbursements." Neither the statute, nor the legislative history, defines the term "disbursements." Because quarterly fees are assessed on a sliding scale as calculated upon the sum total of disbursements, the definition of that term is critical.

The question has been properly phrased as: "[d]oes the term 'disbursements' include all disbursements made by the debtors post-confirmation, or is it limited to disbursements made under the confirmed plan of reorganization?" *In re Sedro–Woolley Lumber Co., Inc.,* 209 B.R. 987, 987 (Bankr.W.D.Wash.1997). The Trustee seeks a broad interpretation of that term to encompass all disbursements made by the debtor, even those made in its ordinary course of business with no relation to the original plan of reorganization. The bankruptcy court interpreted that term narrowly to include only those payments made pursuant to a debtor's confirmed plan of reorganization.

■■■ A brief overview of the bankruptcy process is useful. When a petition for Chapter 11 relief is filed, a bankruptcy estate is created. *See* 11 U.S.C. § 541. The bankruptcy estate is a separate legal entity. *See In re Pace,* 67 F.3d 187, 192 (9th Cir.1995). After confirmation of a reorganization plan, the assets of the bankruptcy estate revest under the name of the reorganized debtor and are no longer part of the bankruptcy estate. 11 U.S.C. § 1141(b). The bankruptcy estate terminates at confirmation because the assets and business are carried on by the reorganized debtor. The majority of the disbursements are then made by the reorganized debtor in the ordinary course of its business.

### B.

Cases that have interpreted the term disbursements in the context of 28 U.S.C. § 1930(a)(6) are divided into three different views: narrow, middle, and broad. *See generally In re Postconfirmation*

*Fees,* 224 B.R. 793, 797 (E.D.Wash.1998). Courts adopting the narrow view hold that, because the bankruptcy estate ceases to exist upon confirmation and there are no longer any disbursements from the estate, only the minimum quarterly fees may be recovered. *See, e.g., In re Celebrity Duplicating Servs.,* 216 B.R. 942, 944–45 (C.D.Cal.1997), *rev'd, In re Celebrity Home Entertainment, Inc.,* 210 F.3d 995 (9th Cir.2000); *In re Maruko Inc.,* 206 B.R. 225, 229–30 (Bankr.S.D.Cal.1997), *rev'd, In re Maruko, Inc.,* 219 B.R. 567 (S.D.Cal.1997). Those courts relied heavily upon the Ninth Circuit's pre-Amendment decision in *St. Angelo v. Victoria Farms, Inc.,* 38 F.3d 1525 (9th Cir.1994), *modified,* 46 F.3d 969 (1995), which held that disbursements include all payments made out of the bankruptcy estate.

In *St. Angelo,* the debtor sold its farm indirectly through an escrow agent and lawyer. *St. Angelo,* 38 F.3d at 1528. In calculating the quarterly fees, the bankruptcy court excluded the sale proceeds from the farm because the disbursement was not made directly by the debtor. *Id.* The district court affirmed, holding that the term disbursement excludes all payments made to a secured creditor from the sale proceeds of the secured property. *Id.* On appeal, the Ninth Circuit reversed, stating that "a plain language reading of the statute shows that Congress clearly intended 'disbursements' to include all payments from the bankruptcy estate." *Id.* at 1534. The Ninth Circuit held that the statute did not distinguish between payments to secured creditors and payments to nonsecured creditors. *Id.*

Relying on the language that the term disbursements includes "all payments from the bankruptcy estate," courts adopting the narrow view interpret the broad holding in *St. Angelo* as limiting disbursements to those made by the bankruptcy estate. *See Celebrity Duplicating Servs.,* 216 B.R. at 944. All payments made post-confirmation of the plan are made by the reorganized debtor, not by the bankruptcy estate

that ceases to exist upon confirmation of the plan. Therefore, under the most narrow interpretation of *St. Angelo,* post-confirmation quarterly fees must necessarily be limited to the minimum amount. *See id.* at 945.

Under the middle view, advocated by Quality Truck and adopted by the bankruptcy court, post-confirmation quarterly fees are calculated only on those disbursements made pursuant to the lingering obligations remaining under the plan of reorganization and not on payments made by the reorganized debtor in the ordinary course of its business. *See, e.g., In re Wintersilks, Inc.,* 243 B.R. 351, 359 (Bankr.W.D.Wis.1999); *In re Danny's Markets, Inc.,* 239 B.R. 342, 347–50 (Bankr.E.D.Mich.1999); *Betwell Oil,* 204 B.R. at 819; *In re SeaEscape Cruises, Ltd.,* 201 B.R. 321, 323 (Bankr.S.D.Fla. 1997); *In re Munford, Inc.,* 216 B.R. 913, 918 (Bankr.N.D.Ga.1997) (noting that the middle view "attempt[s] to harmonize the legislative purpose with the reorganized debtor's right to a 'fresh start' "). Courts adopting this view recognize that applying a minimum quarterly fee would eviscerate the purpose of the Amendment, but find it unfair to the reorganized debtor to base quarterly fees on all post-confirmation disbursements.

The bankruptcy court in *Betwell* reasoned:

> First, it would be grossly unfair to tax the general business operations of a reorganized debtor. Upon the effective date of a plan, except for the limited jurisdiction reserved by the Court under the plan and under the Bankruptcy Code, the reorganized debtor is and should be "out of bankruptcy." If a debtor is no longer operating under court supervision, why would Congress intend for its general business operations to be taxed for the benefit of the [United States Trustee]? Neither the [United States Trustee] or the Bankruptcy Court is involved in the business operations of the reorganized debtor, except to the extent of insuring that the plan is consummated.

*Betwell Oil,* 204 B.R. at 819. In addition, the *Betwell* court based its conclusion on the limited services provided by the Trustee post-confirmation. *Id.* Following plan confirmation, the Trustee has little responsibility or authority to supervise non-plan business operations of the reorganized debtor. *Danny's Markets,* 239 B.R. at 348. The limited statutory post-confirmation duties of the Trustee relate only to supervising the carrying out of the plan, or seeking remedies for failure to do so. *Id.* To the extent that quarterly fees are imposed as a "user fee" to self-fund the bankruptcy system, services rendered are relatively minimal in comparison to quarterly fees that are based on all post-confirmation disbursements. *Id.*

Several other courts have adopted the broad view that quarterly fees are calculated upon all disbursements made by the post-confirmation debtor. *See, e.g., Celebrity Home Entertainment,* 210 F.3d at 999; *Maruko,* 219 B.R. at 571–72; *Boulders on the River,* 218 B.R. at 539–40; *Postconfirmation Fees,* 224 B.R. at 798–99; *A.H. Robins,* 219 B.R. at 151; *N. Hess' Sons,* 218 B.R. at 360–61; *In re P.J. Keating Co., Inc.,* 205 B.R. 663, 666–67 (Bankr.D.Mass.1997). These courts read the quarterly fees statute as covering all disbursements. "Congress did not intend to limit the definition of disbursements through the Amendment. On the contrary, Congress expressly intended to help the U.S. Trustee fund itself by allowing it to charge a fee for all disbursements until a case is converted or dismissed." *Maruko,* 219 B.R. at 572.

### C.

■ I agree with those courts that read the quarterly fees statute broadly. I reject the narrow view because it renders the statute virtually meaningless in collecting post-confirmation quarterly fees. The support that could be found in a strict reading of the *St. Angelo* decision crum-

bled with the Ninth Circuit's decision in *Celebrity Home Entertainment*. *Celebrity Home Entertainment*, 210 F.3d at 998–99. That decision approvingly cited to *A.H. Robins*, which stated:

> The Court refuses to distort the holding in St. Angelo so as to limit the meaning of 'disbursements' to payments made from the bankruptcy estate. First, the St. Angelo court merely stated that 'disbursements' include payments made from the bankruptcy estate. It never stated that 'disbursements' are constituted solely of such assets, nor that other sources of funds are excluded from the meaning of 'disbursements.' Second, the St. Angelo decision was made prior to the Amendment's existence. When St. Angelo was decided, fees were not payable post-confirmation, hence UST fees were only premised upon payments from the bankruptcy estate. The court in St. Angelo, therefore, had no cause to distinguish between payments made out of the bankruptcy estate and those derived from another source, because prior to the Amendment there was simply no other source for UST fees aside from the bankruptcy estate. Finally, the St. Angelo court specifically referred to the ordinary, common meaning of 'disbursement,' finding that it means solely 'to expend ... pay out,' and was obviously not attempting to make 'disbursement' a term of art. This Court, therefore, does not find that St. Angelo limits the meaning of 'disbursements' to payments from the bankruptcy estate, nor that the cases citing St. Angelo to support such a limitation were correctly decided. Rather, the Court finds that all post-confirmation payments made by reorganized debtors, as well as payments from the bankruptcy estate, constitute 'disbursements' for the purposes of the Amendment.

*A.H. Robins*, 219 B.R. at 151 (internal citations omitted).

It is certainly a closer call as to whether the middle or the broad view is appropri-ate. Courts adopting the middle view, and the bankruptcy judge in this case, have clearly done so out of a legitimate concern that the Amendment has an unfair effect on the reorganized debtor. The arguments upon which they rely, however, do not have support in the plain meaning of the statute, the legislative history, or the purpose of the Amendment and overall statute.

The Amendment was included in a revenue-generating measure. *See N. Hess' Sons*, 218 B.R. at 360 ("As a revenue-generating mechanism, [quarterly fees] are akin to a tax."). The purpose of the quarterly fees statute was to help the Trustee fund its own operations; the Amendment was intended to expand the revenue-generating mechanism. *See Maruko*, 219 B.R. at 572. In enacting the Amendment, Congress struck what it considered to be a proper balance so as to provide necessary funds for the operations of the United States Trustee Program. Barring a constitutional infirmity, Congress's decision must be respected. *See TVA v. Hill*, 437 U.S. 153, 194–95, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978).

I see no persuasive reason to define disbursements differently post-confirmation. Congress did not indicate either explicitly or implicitly that it sought a different analysis post-confirmation. *See Maruko*, 219 B.R. at 572; *P.J. Keating*, 205 B.R. at 666–67; *In re Gates Community Chapel of Rochester, Inc.*, 212 B.R. 220, 225 (Bankr.W.D.N.Y.1997). "Absent Congressional expression of a contrary intent, it must be assumed Congress desired this same broad interpretation to apply to reorganized debtors." *P.J. Keating*, 205 B.R. at 667.

It is true that the Trustee performs limited duties post-confirmation, but nowhere in the statute or legislative history is it indicated that Congress sought strict proportionality between the quarterly fees paid and the services rendered, or that those services must correlate with the time when the quarterly fees are paid. The

quarterly fees statute merely establishes a self-funding program by imposing a "user fee." Although the extent of that usage may be diminished in the case of a reorganized debtor post-confirmation, the debtor has certainly received benefits from the Trustee program during the course of the bankruptcy. Accordingly, there is no reason that the term disbursements should be limited by excluding disbursements made in the ordinary course of the reorganized debtor's business.

### V.

I reverse the bankruptcy court's ruling and find that Quality Truck is responsible for quarterly fees on all disbursements made post-confirmation. This case is remanded for further proceedings consistent with this opinion.

The court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented party.